# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 28, 2010

## LARRY BRIAN SHELTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hawkins County**
**No. 08CR0289     John F. Dugger, Jr., Judge**

_____

**No. E2009-01031-CCA-R3-PC - Filed June 8, 2010**

_____

The petitioner, Larry Brian Shelton, appeals from the denial of his petition for post-conviction relief wherein he challenged his Hawkins County Criminal Court jury convictions of first degree felony murder and theft. In this appeal he contends that he was denied the effective assistance of counsel at trial. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and J.C. MCLIN, J., joined.

William Louis Ricker, Greeneville, Tennessee, for the appellant, Larry Brian Shelton.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and J. Douglas Godbee, Assistant District Attorney General, for the appellee, State of Tennessee

**OPINION**

In 2006, a Hawkins County Criminal Court petit jury convicted the petitioner of first degree felony murder and theft of property valued at less than $500 for his role in the death of the victim, Frank Leake. The evidence adduced at the petitioner's trial established that "[o]n March 31, 2004, the body of the victim, Frank Leake, was found lying on the floor of his home on Highway 11W in Hawkins County." *State v. Larry Brian Shelton*, No. E2006-00541-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, July 26, 2007). The petitioner gave a pretrial statement confessing his involvement in the victim's death, explaining that he had gone to the victim's home to purchase prescription pain medication

for his mother. *Id.* at 1-2. According to the petitioner's pretrial statement, when the victim refused to provide the petitioner with the desired product on credit, the petitioner became angry and "accused the victim of cheating the [petitioner]'s mother and again became upset when the victim replied by saying derogatory things about the [petitioner]'s mother." *Id.* at 2. After this exchange, "the victim started to come out of his recliner chair and placed his hand in his pocket," which led the petitioner to believe the victim had a weapon. *Id.* "[T]he [petitioner] kicked the victim, who fell onto the floor," and then the petitioner struck the victim "with a candleholder that the scuffling men had knocked off a table." *Id.* While the victim lay on the floor, the petitioner took his wallet, keys, and a knife, which the petitioner used to stab the victim "two or three times in the shoulder and neck." *Id.* The petitioner also took money from the victim's safe, "two baskets containing a number of pill bottles, a cellular telephone, the candleholder, and a staple gun" and then left the victim's residence. *Id.* During a search of his residence, the petitioner showed officers those items he had taken from the victim. *Id.*

Forensic testing revealed the presence of the victim's blood "on the staple gun, the knife found in the petitioner's home, and the trousers worn by the [petitioner] when the officers arrived at his home shortly after the homicide." *Id.*

> Medical evidence established that the victim had sustained contusions about his face and neck and had been stabbed 15 times, the wounds appearing in the victim's neck, chest, abdomen, and back. Stab wounds that entered through the victim's back punctured his lungs and caused the victim to bleed profusely in the chest cavity. Also, a puncture of the liver caused internal bleeding, and a stab wound to the victim's neck opened the external jugular vein. The victim died from loss of blood.

*Id.*

The petitioner testified consistently with his pretrial statement but added "that he was 45 years old, left school in the ninth grade, and had been on 'disability' as a result of a 'nervous disorder.'" *Id.* at 3. The petitioner explained that he was forced to procure pain medication for his disabled mother because her "personal physician had committed suicide." *Id.* The petitioner also claimed that the victim's reaching into his back pocket caused the petitioner to fear "that the victim was armed with 'a little old pistol'" the victim often carried. *Id.* The petitioner claimed that he only opened the victim's safe to obtain his mother's records and denied stabbing the victim more than three times. *See id.* The petitioner explained why he took the victim's wallet: "I just kind of went off and took his billfold and

showed him I could be able to rule, too, show him I had a little power. He was doing me dirty, and I figured I'd just do him dirty back." *Id.*

> [A] clinical psychologist with specialties in clinical neuropsychology and forensic psychology . . . testified that the [petitioner] had a[n] intelligence quotient of 67, placing him in the mildly retarded range of intellectual functioning. The psychologist also testified that the [petitioner] was schizophrenic and evinced a mixed personality disorder with passive-aggressive, dependent, and depressive features. The witness opined that, due to his disorders and intellectual limitations, the [petitioner] had mis-perceived the victim's actions on March 31, 2004, "and so completely acted in a way that none of the others of us would."

*Id.* at 3-4.

This court affirmed the petitioner's convictions as well as his jury-imposed sentence of life imprisonment without the possibility of parole, *see id.* at 11, and our supreme court denied permission to appeal, *see State v. Larry Brian Shelton*, No. E2006-00541-SC-R11-CD (Tenn. Oct. 15, 2007).

On September 23, 2008, the petitioner filed a timely petition for post-conviction relief alleging that "the State's case was the product of an illegal search and sei[z]ure," that his sentence violated his right to a jury trial, and that felony murder was not "the proper charge." Following the appointment of counsel, the petitioner filed an amended petition claiming that he had been denied the effective assistance of counsel at trial. Specifically, the petitioner contended that trial counsel failed to review the discovery materials with him; failed to adequately prepare him to testify and, indeed, "should have discouraged" him from testifying; failed to adequately present the defense theories to the jury; and failed to present mitigating evidence during the sentencing phase of his trial.

At the evidentiary hearing on his petition for post-conviction relief, the petitioner testified that he had been incarcerated since being arrested on May 31, 2004. While he was incarcerated prior to trial, psychologist Eric Engum performed a forensic psychological evaluation that established that the petitioner had an intelligence quotient of 67. Prior to trial, the petitioner also spent time at Middle Tennessee Mental Health Institute and Frontier Health in Kingsport being evaluated and treated for mental health issues. At the time of trial, he was taking "Seroquel, Valium 5, [and] Prozac," which caused him to feel "[f]uzzy headed." The petitioner stated that neither trial counsel nor the investigator hired

by trial counsel ever showed him the photographs taken of the crime scene and that he could not recall trial counsel's showing him any of the other discovery documents. Although the petitioner claimed that he would have pleaded guilty rather than proceed to trial had he seen the photographs prior to trial, he admitted that the State never extended any offer for him to plead to a lesser charge. The petitioner also admitted killing the victim.

The petitioner stated that he testified at his trial because "they told [him] it was ready to go." He could not recall whether his trial counsel told him he did not have to take the stand. The petitioner admitted that trial counsel rehearsed the process of testifying with him and recommended that he testify at trial. The petitioner agreed that he would not testify "if he had it to do over." The petitioner stated that trial counsel "might have" presented evidence to support his claim that he killed the victim in self-defense.

During cross-examination, the petitioner admitted kicking the victim's teeth out, beating him with a staple gun and candlestick, and "poking him with a knife to see what it felt like." The petitioner stated that the victim "owed [his] mom a bunch of money" but denied that the debt motivated him to kill the victim. The petitioner also admitted reviewing "every single exhibit one-by-one" with his attorney, the prosecutor, and the judge during a motions hearing, but he claimed that he was "[u]nder the influence of [his] medication, probably." He conceded that trial counsel's investigator, Lawrence Smith, went over the evidence with him "up at the jail . . . a few times." The petitioner agreed that "at one time" he intended to plead guilty but elected not to do so because he "wanted to tell [his] story to the jury."

Lawrence Smith, an investigator with the public defender's office, testified that he met with the petitioner to review the discovery materials "[n]umerous times," including showing the petitioner all photographs, witness statements, and laboratory results. Mr. Smith stated that, at one point, the petitioner intended to enter a plea of guilty but that he "kept changing his mind." Mr. Smith recalled that based upon his conversations with the petitioner, he investigated whether the victim's stepson, Tony Knight, had been involved in the victim's murder. Based on his discoveries, the State also investigated Mr. Knight's involvement. During his investigation, Mr. Smith reviewed the petitioner's medical records, work history, education records, and criminal history. He also interviewed the petitioner's family, friends, and neighbors.

During cross-examination, Mr. Smith acknowledged that the petitioner's medical history established that the petitioner had suffered a head injury during a car accident sometime before the offenses. Mr. Smith stated that neither he nor trial counsel advised the petitioner to take the stand but instead told him, "Larry, it is up to you to make a decision because if you're convicted I cannot serve the time for you, these decisions you have to make

-4-

based on what you think the evidence will show."

Trial counsel, the Third Judicial District Public Defender, testified that he undertook representation of the petitioner at the general sessions court level. He stated that he asked that the petitioner receive a mental health evaluation, which established that the petitioner was competent to stand trial and that an insanity defense could not be supported. He stated that he was concerned about proceeding to trial because "while [the petitioner] can be quite coherent, he can also very easily slip into a state of mind where it was very hard to follow him or deal with him." Trial counsel testified that after the case proceeded to the criminal court level, he procured the services of Doctor Eric Engum to provide further psychological testing to the petitioner. He said that he and Mr. Smith gathered a "large history regarding" the petitioner in an effort to marshal mitigation proof. Trial counsel testified that he reviewed all discovery materials, including numerous photographs, with the petitioner, "prepared every motion [he] could think of, . . . challenged the search, [and] challenged the statement."

Trial counsel testified that the State offered to allow the petitioner to plead guilty in exchange for a sentence of life imprisonment and that the petitioner was initially interested in taking the offer. During conversations with trial counsel, however, the petitioner would say that he wanted to enter the guilty plea "but [he] want[ed] to tell the jury what happened because" he did not believe he was guilty of murder. Trial counsel explained, "I would go so far as to try to explain best interest pleas but it reached the point to where Larry was confusing me quite a bit. I mean, you were reaching a point where you can't plea and have a trial." He said that Doctor Engum attempted to help explain the process to the petitioner. As a result of those discussions, Doctor Engum told trial counsel that the petitioner "had decayed in jail to the extent to where he could not help me. He could enter a plea and . . . he also couldn't go to trial. Consequently, the case was reset."

Trial counsel testified that the petitioner "never indicated anything but that he wanted to testify" until the sentencing phase, when he refused to do so. He recalled that Doctor Engum testified during the guilt phase of the petitioner's trial and that he referenced Doctor Engum's testimony many times during the sentencing phase of the trial. He acknowledged that he only called a single witness during the sentencing phase, a Mr. Hughes. Counsel explained that the other witnesses the petitioner suggested "concerned" him because of their potential to damage the petitioner's case. Trial counsel stated that he raised self-defense to the best of his abilities and pointed out that the trial court instructed the jury on self-defense as well as all applicable lesser included offenses.

During cross-examination, trial counsel testified that nothing about the petitioner's behavior at the pretrial conference caused him concern and that he "thought [the

petitioner] knew what was going on." He stated that he reviewed with the petitioner those questions he would ask on direct examination and those that might be asked on cross-examination. He said he also asked the petitioner "to please learn to listen to the question and not be ashamed if he didn't hear it, make sure he understands it, answer the question that's asked honestly." Describing the petitioner's trial testimony, trial counsel said, "He answered the questions that were asked . . . and he stayed consistent. He could have been much worse . . . ."

In its order denying post-conviction relief, the post-conviction court found that the petitioner "failed to present any proof on his initial grounds alleged in his petition for post-conviction relief" and that those issues had been previously determined by this court on direct appeal. The court, therefore, dismissed those claims. With regard to the remaining claims, each of which alleged that the petitioner's trial counsel had been ineffective, the trial court found "that [the petitioner] received effective assistance of counsel in every phase of representation . . . in the trial court." Concluding that the petitioner "simply was not a credible witness" while trial counsel and Mr. Smith "were credible witnesses," the court found that counsel adequately communicated with the petitioner, including reviewing discovery materials with him, that counsel adequately investigated the case, and that counsel thoroughly presented the defense of self-defense at trial. The trial court also determined that trial counsel presented sufficient mitigating proof through the trial testimony of Doctor Engum and the sentencing phase testimony of Mr. Hughes. The trial court found "that all lesser included offenses were included in the jury instructions."

Following the denial of his petition for post-conviction relief, the petitioner filed a timely notice of appeal. In this appeal, the petitioner again claims that he was denied the effective assistance of counsel via his counsel's failure to present live testimony regarding the petitioner's mental health issues during the sentencing phase of the petitioner's trial and failure to adequately prepare for and/or discourage him from testifying at trial. The State submits that the petitioner has failed to establish either claim by clear and convincing evidence. We agree with the State.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first whether "the advice given, or the services rendered by the attorney, are within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

Initially, the petitioner claims that the post-conviction court erred by failing to "analyze the nature and extent of the mitigating evidence that was available and not presented" before determining whether the failure to present the evidence affected the jury's sentencing verdict. However, the record establishes that the petitioner failed to present in the post-conviction hearing any mitigation evidence that was available to trial counsel but not presented to the jury. Trial counsel testified that although he did not call Doctor Engum as a witness during the sentencing phase of the petitioner's trial, Doctor Engum had testified extensively during the guilt phase of the trial regarding the petitioner's mental health issues, and trial counsel referenced Doctor Engum's testimony extensively during the sentencing hearing.

Furthermore, although the petitioner contends that the post-conviction court

erred by making its determination in the absence of the trial transcript, the record establishes that the petitioner did not offer the transcript into evidence at the hearing on the petition for post-conviction relief and made no other effort to exhibit the transcript to the hearing. *See* T.C.A. § 40-30-110(f). The petitioner made a request that the trial record be transcribed and provided to his post-conviction counsel; however, that request was made on May 26, 2009, 12 days after the post-conviction court entered its order denying relief and six days after the petitioner filed his notice of appeal. Had the petitioner desired that the post-conviction judge, who did not preside over the petitioner's trial, examine the trial transcript, it was the petitioner's duty to provide the transcript as an exhibit at the evidentiary hearing. *Id.* Having failed to do so, he cannot now be heard to complain that the post-conviction court erred by failing to review evidence that was never presented. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Most importantly, trial counsel's accredited testimony established that Doctor Engum's conclusions regarding the state of the petitioner's mental health were presented to the jury during the trial. The petitioner has failed to establish by clear and convincing evidence that having Doctor Engum repeat those findings during the sentencing phase of the trial would have affected the jury's verdict.

The petitioner also claims for the first time on appeal that trial counsel should have called the "nurse at the detention center [who] treated the [p]etitioner during his incarceration" or other mental health professionals as witnesses during the sentencing hearing. He has waived this claim, however, by presenting it for the first time on appeal, *see State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."), and by failing to present the nurse as a witness at the evidentiary hearing, *see Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

The petitioner also claims that his trial counsel performed deficiently by failing to adequately prepare him to testify and that, in fact, trial counsel should have discouraged the petitioner from testifying at trial. He asserts that he "was not mentally able to testify effectively and could not rationally decide whether or not to testify without competent advice from counsel." The record, however, does not support these assertions. The accredited testimony of both trial counsel and Mr. Smith established that both advised the petitioner on what to expect at trial and informed him, correctly, that the decision whether to testify was his alone. Trial counsel stated that he began preparing the petitioner to testify on "day one"

because the petitioner indicated from the outset of their relationship his desire to tell a jury exactly what had happened in the victim's home. Further, trial counsel testified that the petitioner behaved appropriately during his testimony and answered the questions asked of him. We cannot say that trial counsel's legally accurate advice that the decision whether to testify belonged to the petitioner qualifies as deficient performance.

Because the petitioner has failed to establish by clear and convincing evidence that he was denied the effective assistance of counsel at trial, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE