**STATE of Tennessee, Appellee,**

v.

**Timothy Wayne JOHNSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Sept. 30, 1996.

Application for Permission to Appeal Denied by Supreme Court Dec. 8, 1997.

B. Campbell Smoot, District Public Defender, Tullahoma, for Appellant.

Charles W. Burson, Attorney General and Reporter, Robin L. Harris, Assistant Attorney General, Criminal Justice Division, Nashville, C. Michael Layne, District Attorney General, Stephen E. Weitzman, Asst.

District Attorney General, Manchester, for Appellee.

## *OPINION*

HAYES, Judge.

The appellant, Timothy Wayne Johnson, was convicted of aggravated rape by a Coffee County jury. The jury affixed a fine of fifty thousand dollars and the court imposed a sentence of twenty years incarceration in the Department of Correction. The court also ordered that the appellant serve the entire sentence, undiminished by any sentence reduction credits, as a multiple rapist, pursuant to Tenn.Code Ann. § 39–13–523 (1994 Supp.).[1] The appellant now appeals both his conviction and sentence, challenging: (1) the sufficiency of the evidence; (2) his classification as a multiple rapist; and (3) the length of his sentence.

After a review of the record, we find no error in the judgment of the trial court. Accordingly, the appellant's conviction and sentence are affirmed.

## I. BACKGROUND

On August 9, 1993, Melanie Dickinson was in the process of moving to a mobile home located on Highway 53 in Coffee County. Dickinson had enlisted the help of Donald Stacey, a friend for over ten years. Because the electricity was not yet turned on at the mobile home, Dickinson and Stacey spent the night at his mother's house.

The next morning, while walking to a nearby store for gasoline for his car, Stacey encountered the appellant. The appellant, who was in his car, inquired whether Stacey needed any assistance. Stacey noticed the appellant "smoking a joint," so he refused the appellant's offer. Before driving off, the appellant informed Stacey that he had to be in Woodbury for court at 9:00 a.m.

Around 1:00 p.m., the appellant and Stacey again met. Both men then traveled to a friend's house to socialize. At the friend's house, alcohol and drugs were available. La-

ter that afternoon, the appellant and Stacey left the house. On the way back toward Stacey's house, the appellant indicated that he needed to use the restroom. As the two passed Dickinson's new residence, Stacey indicated that "Melanie [Dickinson] lived there." They stopped and the appellant asked Dickinson if he could use her bathroom. She directed him to the bathroom and then continued to talk with Stacey in the living room. Stacey testified that Dickinson asked him to retrieve a can from the appellant's vehicle.[2] He did as she requested and gave the can to Dickinson. Stacey stated that Dickinson joined the appellant in the bathroom, and she and the appellant remained alone in the bathroom for about five to ten minutes. Stacey also testified that the appellant "was high that night." The appellant and Stacey left Dickinson's residence around 6:30 p.m. At trial, Dickinson denied asking Stacey to retrieve the can and denied smoking crack cocaine. Additionally, law enforcement investigators found no evidence at the victim's home corroborating Stacey's story.

At 10:30 that same evening, the appellant returned to Dickinson's mobile home, alone, in a small white car. At this time, Dickinson was clad in a cut-off t-shirt and cut-off shorts. When the appellant asked Dickinson if she wanted a beer, she refused, indicating that she was busy. However, Dickinson again permitted the appellant to use her bathroom. When he came out of the bathroom, the appellant made a sexual comment to Dickinson about her clothing. Apparently, this comment made Dickinson uncomfortable, and she asked him to leave. The appellant walked toward the front door, but instead of leaving, he reached for Dickinson and threw her on the couch. He began tugging on her shorts as she hit him with her fists. Her efforts were unsuccessful as the appellant held her down with one hand and pulled her shorts off with the other. Despite Dickinson's pleas, the appellant forcefully inserted his penis into her vagina.

---

1. The Multiple Rapist statute became effective July 1, 1992. *See* Acts 1992, ch. 878, § 1.

2. Testimony indicated that drug users often fashion a crude smoking apparatus out of an empty soda can to smoke crack cocaine.

Throughout the sexual attack, Dickinson struggled with the appellant in an attempt to free herself, but to no avail. She screamed, in an effort that someone might hear her plight. The appellant told her to shut up several times and said if she did not "shut up he would make [her]." He threatened her with a nine millimeter, which he said was in his car. He also held a hammer to her head. "He suffocated [her] with one of [her] pillows that were on the couch and he was choking [her] one time so hard that [she] couldn't breathe at all." The appellant ended this first assault when "he got through," i.e. ejaculated. However, only five to ten minutes elapsed before the second assault began. Dickinson stated that the second episode lasted for about thirty minutes.

Dickinson testified that she was unable to escape because the appellant physically restrained her slightest movement. In a moment of desperation, Dickinson told the appellant that she saw headlights and that "someone must be coming." When the appellant moved toward the window to confirm the fact, Dickinson ran out the back door, clad only in her cut-off t-shirt, and did not stop until she reached Velma Alford's front porch, one hundred yards away from her residence. Dickinson began beating on the door, screaming for Alford to "let [her] in." Upon opening the door, Alford looked toward Dickinson's home and observed a "figure of a man walking to a white car."

Alford notified the Sheriff's Department of the incident. At 2:20 a.m., Deputy Brian Allen was dispatched to Velma Alford's residence. When he arrived, he noticed that Dickinson was clad in Alford's clothing and a blanket. He observed that Dickinson was "extremely upset, ringing her hands.... She had to ... get a grip on herself. She was wiping her eyes, trembling." Deputy Robert Argraves also responded to the call to Alford's residence. He testified that Dickinson was "upset, crying, shaking." He also remarked that, "she looked a mess."

Allen and Argraves left Alford's home around 3:00 a.m. The two deputies accompanied Alford and Dickinson to the Coffee County Medical Center for a physical examination. Joan Lansford, the attending R.N.,

obtained various samples from the victim and returned the "rape kit" to Deputy Allen, who then gave the kit to Detective Steve Luttrell. Ronnie Gault, a captain with the Coffee County Sheriff's Department, retrieved the kit from Luttrell and transported it to the crime lab in Nashville. Samera Zavaro, a forensic scientist with the Tennessee Bureau of Investigation, broke the seal of the rape kit and examined the contents. As a result of her examination, she determined that spermatozoa cells were present in the included sample. However, the testing was inconclusive, because the appellant and Ms. Dickinson have the same blood type.

At trial, Dr. Ja–Nan Yu, the attending physician at the Coffee County Medical Center, testified that he completed the physical examination of Dickinson on August 11, 1993. He explained that there was no "evidence of a tear or bleeding in the vagina or in the surrounding area, and there was very little fluid inside the vaginal cavity." During redirect, he agreed with the prosecutor that, when a woman stands up and walks around, semen will naturally drain from the vagina. Joan Lansford testified concerning Dickinson's physical appearance. Lansford stated that Dickinson's

> lips were slightly swollen ... She had a reddened mark area on her neck. It was like a band. She had an abrasion type of thing on her—above her right elbow. On the back she had small bruising above the buttocks. It was just small areas and they were bluish. The legs, on the thighs, knees, and lower legs, there were small bruised areas. She was upset.

Lansford also testified that she was unable to determine whether Dickinson was under the influence of an intoxicant.

## II. SUFFICIENCY OF THE EVIDENCE

■ In his first issue, the appellant contends that the "jury found [him] guilty of aggravated rape primarily upon the testimony of the alleged victim." Consequently, he argues, the evidence is insufficient to support the finding of the jury. We disagree.

When there is a challenge to the verdict based upon the sufficiency of the evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn. 1994); Tenn.R.App.P. 13(e). We do not reweigh or reevaluate the evidence; these are issues resolved by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Furthermore, a guilty verdict accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). The appellant bears the burden of proving that the evidence is insufficient to support the jury verdict in his case. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

In order to sustain a conviction for aggravated rape, the State must prove, beyond a reasonable doubt, that there was "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by"

> (1) Force or coercion ... and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonable to believe it to be a weapon.

Tenn.Code Ann. § 39–13–502 (1991).[3]

Ms. Dickinson testified that the appellant inserted his penis into her vagina without her consent, during two separate encounters. She also testified that the appellant threatened her with a hammer and attempted to suffocate her with a pillow in an attempt to stop her from screaming. Dickinson further asserted that the appellant threatened her with a nine millimeter gun, which the appellant said was in his car. These facts satisfy the elements set forth in Tenn.Code Ann. § 39–13–502(1).

However, the appellant points to differences between the testimony of Ms. Dickinson and that of Donald Stacey. In particu-

lar, he notes that Dickinson denied asking Stacey to retrieve a cola can from the appellant's vehicle and denied staying in the bathroom with the appellant for any length of time. The appellant, in effect, argues that the jury should have believed the testimony of Donald Stacey, and not that of Ms. Dickinson. Again, it is a well-established principle that questions regarding the credibility of the witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact and *not* this court. *Cabbage,* 571 S.W.2d at 835. This contention is meritless.

Additionally, the appellant points to the evidence gathered during the initial rape examination. Dr. Yu testified that, pursuant to his examination of Dickinson on August 11, 1993, he did not see any evidence of a tear or bleeding in the vagina or surrounding area and that there was very little fluid inside the vaginal cavity. The appellant contends that, based on Dr. Yu's testimony, the jury could not have found the appellant guilty of aggravated rape. We disagree. First, Tenn.Code Ann. § 39–13–502 does not require a medical finding of a tear, bleeding or fluid in the vaginal area in order to sustain a conviction for aggravated rape. Nonetheless, the "fluid" obtained during the physical examination of Dickinson did contain spermatozoa. Dickinson testified that the appellant only ended his sexual assault when "he got through," meaning ejaculation. Furthermore, Dr. Yu conceded that when a woman stands up and walks around following penetration with ejaculation, the semen drains from her vaginal area. In the present case, Dickinson ran from her house, one hundred yards to Alford's house in nothing but a t-shirt. Here, the possibility that semen drained from Ms. Dickinson is great. The jury reasonably resolved any conflict between Dr. Yu's findings and the remaining evidence, including the findings of the forensic expert. This issue is without merit.

## III. CLASSIFICATION AS MULTIPLE RAPIST

The appellant contests his classification and sentencing as a multiple rapist under

---

**3.** The indictment only alleged a violation of Tenn.Code Ann. § 39–13–502(1).

Tenn.Code Ann. § 39–13–523. Initially, he argues that, at the time of his guilty plea to rape in 1988, the multiple rapist statute was not enacted. Accordingly, he contends that he was not provided with notice of the possibility of enhanced sentencing if convicted in the future of the same offense, and was thereby deprived of his due process rights. The appellant argues that the multiple rapist statute operates *ex post facto* against him by inflicting a greater punishment than that contemplated when the crime was committed. Finally, the appellant insists that the statute is unclear and vague as to whether "there [has] to be two convictions prior to the one upon which the defendant is now being sentenced" in order to implicate Tenn.Code Ann. § 39–13–523. We disagree and conclude that the appellant's arguments are totally misplaced and without merit.

Tenn.Code Ann. § 39–13–523, in parts pertinent to this case, provides:

(2) "Multiple rapist" means a person convicted two (2) or more times of violating the provisions of § 39–13–502 or § 39–13–503, or a person convicted at least one (1) time of violating § 39–13–502, and at least one (1) time of § 39–13–503.

(b) Notwithstanding any other provision of law to the contrary, a multiple rapist ... shall be required to serve the entire sentence imposed by the court undiminished by any sentence reduction credits such person may be eligible for or earn.

(e) The provisions of this section requiring multiple rapists to serve the entire sentence imposed by the court shall only apply if at least one (1) of the required offenses occurs on or after July 1, 1992.

The prosecutor sought and the trial court granted the appellant's classification as a "multiple rapist" based on the appellant's prior conviction for rape on April 8, 1988, and on the present conviction for aggravated rape on August 11, 1993.

 First, it is well-established that penalty enhancing statutes only enhance the sentence for the triggering offense, rather than punish prior acts. *See Gryger v. Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683 (1948) (citations omitted) ("[T]he fact that one of the convictions that entered into the calculations by which petitioner became a fourth offender occurred before the Act was passed, [does not] make the Act invalidly retroactive."); *State v. Bomar,* 213 Tenn. 487, 376 S.W.2d 446, 447 (1964); *Conrad v. State,* 202 Tenn. 36, 302 S.W.2d 60 (1957). *See also* Suzanne M. McDonald, *Foreseeability as a Limitation on the Retroactive Application of Judicial Decisions: Davis v. Nebraska,* 26 CREIGHTON L.REV. 931, 948–49 (1993); Joel W.L. Millar, *Nichols v. United States, The Right to Counsel, and Collateral Sentence Enhancement: In Search of a Rationale,* 144 U.PA.L.REV. 1189, 1191–93 (1996). The punishment is enhanced for the latest crime alone. Thus, the multiple rapist statute does not operate *ex post facto.*

 Additionally, we conclude that the language is neither vague or unclear so as to confuse the ordinary reading of the statute. The Court's primary objective in interpreting statutes is to determine the legislative intent behind the statute. *State v. Smith,* 893 S.W.2d 908, 917 (Tenn.1994), *reh'g denied,* (Tenn.1995), *cert. denied.* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995). In doing so, we look first to the statute itself and rely, when possible, upon the ordinary meaning of the language and the terms used, refraining from any forced or subtle construction to limit or extend the statute's meaning. *Id.* The purpose behind the legislative enactment of Tenn.Code Ann. § 39–13–523 is to enhance the punishment of those who commit rape and/or aggravated rape more than once. Thus, upon a second conviction, as indicated by the plain language of the statute, a defendant is susceptible to sentencing as a multiple rapist. Moreover, the language that at least one conviction must occur after July 1, 1992, indicates that the current conviction may count toward the two rape convictions required under Tenn.Code Ann. § 39–13–523. Thus, since the appellant's current conviction occurred after July 1, 1992, as required by the statute, the appellant was properly sentenced. The appellant's challenges to Tenn.Code Ann. § 39–13–523 are without merit.

## IV. SENTENCING

 The appellant also claims that the sentence imposed by the trial court is exces-

sive. For his conviction of aggravated rape, a class A felony, the appellant was eligible, as a Range I offender, for a sentence of not less than fifteen nor more than twenty-five years. Tenn.Code Ann. § 40–35–112(a)(1) (1990). The trial court imposed a twenty year sentence.

At the time of the sentencing hearing, the appellant was twenty-eight years old, married, and the father of two small children. Testimony at the sentencing hearing in addition to the pre-sentence report indicate that the appellant has a long history of criminal conduct. While a juvenile, the appellant was convicted of over eleven offenses, including assault, robbery, and burglary. His troubled path continued, resulting in over seventeen convictions as an adult, including the felony conviction in 1988 for rape. The appellant also has an extensive history of drug and alcohol abuse. Approximately four months prior to the instant offense, the appellant reported using "2 [two] eight balls of cocaine daily ..., drinking two cases of beer and/or one to two fifths of liquor daily ..., and smoking a quarter ounce of pot daily...." Although he has sought treatment at various times, all of the appellant's attempts at substance rehabilitation have been futile. Likewise, the appellant's continued participation in criminal conduct shows his utter disregard for the law.

Scholastically, the appellant was a below average student, maintaining grades of mostly C's, D's, and F's. While in school, the appellant reports that he involved himself in fighting, using controlled substances, and being truant. Additionally, he admits that he did not respond to requests by his teachers, did not complete homework assignments, and was uncooperative in general. The record indicates that the appellant left school after the seventh grade. The appellant does not have his GED, and, although he states that he completed training in small engine repair at the vocational school in McMinnville, the school could not locate corroborating records. Furthermore, while the appellant reports past employment in construction and landscaping, of the three jobs listed on his pre-sentence report: one job was not verifiable, he was fired from another for unreliability in

reporting to work, and he was fired from another for suspicion of stealing.

A psychological examination of the appellant revealed a violent and dysfunctional home life as a child. He reports that his father is an alcoholic who physically and verbally abused him and his mother. He also reports verbal abuse from his mother and extensive substance abuse by his other siblings. The appellant also admits to beginning daily use of controlled substances at an early age, as well as becoming sexually promiscuous during early adolescence. Despite the appellant's complaints of hallucinations, suicidal thoughts, et al., a psychological evaluation indicated that the appellant was "attempting to exaggerate psychological symptoms for some specific gain," and that, although the appellant was competent, "he does exhibit poor social judgment and difficulties controlling impulses." The evaluation concluded that the appellant's "personality problems are exacerbated with the use of drugs which increase the possibility of acting out in antisocial patterns."

The trial judge did not expressly state which enhancement or mitigating factors applied. However, he noted several sentencing considerations. First, the trial judge conceded that the appellant has some problems, notably the appellant's family situation and his limited intelligence. However, he stated that these handicaps do not "excuse substance abuse whether you are smart or stupid, and it doesn't excuse what that continuous substance abuse leads to." In his sentencing order, the judge noted that, at the time of the present offense, the appellant was on probation from a drug conviction in Rutherford County. Moreover, he remarked that the appellant has had "twenty-eight separate encounters with law enforcement." Accordingly, the trial court stated "that the defendant poses a threat to society" and is "a multiple rapist as contemplated by the statute."

When a challenge is made to the length, range, or manner of service of a sentence, this court makes a *de novo* review of the sentence with the presumption that the determination made by the trial court is correct. Tenn.Code Ann. § 40–35–401(d) (1990).

In making its review, this court must consider the evidence heard at trial and at the sentencing hearing, the presentence report, the principles of sentencing, the arguments of counsel, the nature and characteristics of the offense, any mitigating and enhancement factors, the defendant's statements, and the defendant's potential for rehabilitation. Tenn.Code Ann. §§ 40–35–102, –103(5), –210(b) (1990); see also State v. Byrd, 861 S.W.2d 377, 379 (Tenn.Crim.App.1993) (citing State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991)). The burden is now on the appellant to show that the sentence imposed was improper. Sentencing Commission Comments to Tenn.Code Ann. § 40–35–401(d) (1990).

Regarding the length of a sentence, the presumptive sentence shall be the minimum sentence in the range if there are no enhancement or mitigating factors. Tenn.Code Ann. § 40–35–210(c). If there are enhancement factors but no mitigating factors, the court may set the sentence above the minimum in the range, but still within the range.[4] Tenn.Code Ann. § 40–35–210(d). However, if both enhancement and mitigating factors are present, the court must start at the minimum, enhance the sentence according to the enhancement factors, and then reduce the sentence according to the mitigating factors. Tenn.Code Ann. § 40–35–210(e).[5]

Upon de novo review, we find no error in the trial court's imposition of a sentence of twenty years incarceration. We conclude that three enhancing factors are applicable. First, the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn.Code Ann. § 40–35–114(1). The victim was treated with exceptional cruelty in that she was beaten, choked, and suffocated by the appellant throughout his attack. Tenn.Code Ann. § 40–35–114(5). Finally, the victim suffered bodily injury as a result of the felony. Tenn. Code Ann. § 40–35–114(11). Moreover, we do not find any mitigating factors applicable to the present case. The appellant received the mid-range sentence of twenty years for his offense. Thus, given the presence of three enhancers and the absence of any mitigators, we conclude that the appellant has failed to show that the sentence imposed is improper. Tenn.Code Ann. § 40–35–401(d). Accordingly, the sentence imposed by the trial court is affirmed.

## V. OTHER ISSUES NOT SPECIFICALLY RAISED

The appellant, in his brief, raises two sub-issues in his sufficiency of the evidence argument. Although not properly presented, the appellant contends that the appellant was denied a fair trial due to (1) the prosecutor's reference to the appellant as "the black man named Tim" and (2) the racial composition of the jury.[6] Initially, we note that the appellant has waived these issues for various reasons. First, the appellant does not state these propositions in the form of issues as required by Tenn.R.App.P. 27(a)(4). Second, the appellant has failed to brief these issues and he has failed to cite to any authority to support these issues.[7] Tenn.R.App.P. 27(a)(7); 27(h); Tenn.Ct.

---

4. Effective July 1, 1995, the presumptive sentence for a class A felony is the mid-point of the range. Tenn.Code Ann. § 40–35–210 (1996 Supp.).

5. The statutory mitigating and enhancing factors are set forth in Tenn.Code Ann. § 40–35–113 (1990) and Tenn.Code Ann. § 40–35–114 (1996 Supp.).

6. The appellant phrases these issues as:
 "Was the all white jury prejudiced because a black man was charged with raping a white woman. The Assistant Attorney General who tried this case referred to the defendant at least eleven times as a black man or black guy named Tim. Racial considerations should have played no part in the case at bar."

7. As noted above, the appellant included these issues under his argument for sufficiency of the evidence. "[The Tennessee Rules of Appellate Procedure do] not contemplate that an appellant may submit one blanket issue as to the correctness of the judgment and thereby open the door to argument upon various issues which might affect the correctness of the judgment." State v. Lewis, No. 2 (Tenn.Crim.App. at Jackson, Dec. 23, 1987) (Jones, J. concurring) (quoting Leeson v. Chernau, 734 S.W.2d 634, 637 (Tenn.App. 1987)). In additional to the issues cited above, the appellant questions the admissibility of the rape kit at trial due to the chain of custody. However, we cannot discern any valid claim relating to the admission of the rape kit. At trial, both sides stipulated that the results of the testing of the fluid found in the victim's vaginal area

Crim.R.App. 10(b). Moreover, the appellant did not make any contemporaneous objection, at trial, to the prosecutor's remarks or enter a pre-trial challenge to the composition of the jury. *State v. Sutton,* 562 S.W.2d 820, 825 (Tenn.1978); *see also* Tenn.R.Crim.P. 12(b); 12(f). Nevertheless, we elect to succinctly discuss the appellant's allegations.

### A. Prosecutorial Misconduct

The appellant contends that his trial was unduly prejudiced by the racial remarks of the assistant district attorney general. In addition to the above stated reasons for finding waiver, the appellant also failed to raise this issue in his motion for new trial. Issues raised for the first time on appeal are considered waived. Tenn.R.App.P. 36; *see also Butler v. State,* 789 S.W.2d 898 (Tenn.1990); *Hester v. State,* 2 Tenn.Crim.App. 11, 450 S.W.2d 609 (1969). Notwithstanding waiver, the record reflects that the assistant district attorney general referred to the appellant as "the black man named Tim" a total of twelve times throughout the trial. The record, as a whole, indicates that the assistant district attorney general's reference to the appellant by race was perhaps an imprudent attempt to distinguish the appellant, who is African–American, from his companion, Donald Stacey, who is Caucasian. We conclude, however, that this characterization was neither so inflammatory nor "so prejudicial to the [appellant] as to invalidate his conviction." *Judge v. State,* 539 S.W.2d 340, 343 (Tenn. Crim.App.1976). This issue is without merit.

### B. Systematic Exclusion

With some effort we are able to glean from the appellant's brief and his motion for new trial, a feeble attempt to challenge the racial composition of the jury. However, the record contains no proof to support the appellant's allegation that he was

were inconclusive as to the identity of the perpetrator. As such, the rape kit is immaterial to the determination of the appellant's guilt. Moreover, the record does not indicate any abuse of discretion on behalf of the trial court in admitting the rape kit. *See Ritter v. State,* 3 Tenn. Crim.App. 372, 462 S.W.2d 247, 249 (1970).

8. These criteria are:
(1) the group alleged to be excluded is a "distinctive" group in the community;

prejudiced by an all white jury. Tenn. R.App.P. 36(a). In any event, the fact that a defendant is tried by a jury which has no African–American on it is not, *per se,* proof of the violation of any right. *State v. Smith,* No. 01C01–9201–CC–00021 (Tenn.Crim.App. at Nashville, Sept. 11, 1992), *perm. to appeal denied,* (Tenn. Nov. 30, 1992) (citation omitted). The appellant, through lack of argument and failure to include pertinent parts of the record, has failed to establish a *prima facie* case of systematic exclusion in accordance with *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) (setting forth three criteria necessary in order to establish a prima facie case of purposeful discrimination).[8] This issue is without merit.

### VI. Conclusion

After reviewing the record, we find that the evidence is sufficient to sustain the jury's finding of guilt. Additionally, we find that no errors exist prejudicing the appellant's right to a fair trial. Moreover, we conclude that, given the appellant's past criminal and social history, in addition to the nature of the current offense, the trial judge appropriately sentenced the appellant to twenty years incarceration. Finally, we have determined, that enhancing the appellant's sentence pursuant to the Multiple Rapist statute is in accord with the legislative intent and the plain meaning of the Act. We find no error in the judgment of conviction and sentence imposed by the trial court. Accordingly, the judgment of the trial court is affirmed.

SMITH, J., and WILLIAM S. RUSSELL, Special Judge, concur.

(2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation the number of such persons in the community; and
(3) this under representation is due to the systematic exclusion of the group in the jury selection process.
*Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668; *see also State v. Evans,* 838 S.W.2d 185, 193 (Tenn.1992), *cert. denied,* 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 702 (1994).