IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2015

## STATE OF TENNESSEE v. MICHAEL CHARLES LUGIAI

**Appeal from the Criminal Court for Davidson County**
**No. 2013-B-1148     Cheryl Blackburn, Judge**

_____

**No. M2014-01813-CCA-R3-CD – Filed August 13, 2015**

_____

The defendant, Michael Charles Lugiai, appeals his Davidson County Criminal Court jury conviction of aggravated robbery, contending that the trial court erred by refusing to suppress the statements he made to law enforcement officers. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Jay Umerley (on appeal), Nashville, Tennessee, and Michael Shaw Cunningham (at trial), Nashville, Tennessee, for the appellant, Michael Charles Lugiai.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Megan M. King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In May 2013, the Davidson County Criminal Court grand jury charged both the defendant and Stevie Tyler Taylor[1] with one count of the aggravated robbery of David White. The trial court conducted a jury trial in May 2014.

The State's proof at trial showed that, sometime prior to February 13, 2013, Mr. White had cashed a check for approximately $1,800 that he had received from a Pell Grant. Mr. White kept the cash on his person, and, although Mr. White did not tell the

---

[1]     The grand jury also charged Stevie Tyler Taylor a/k/a Steven Tyler Taylor with one count of being a felon in possession of a handgun and one count of resisting arrest in the same indictment.

defendant about the money, the defendant saw the money when Mr. White paid to repair the defendant's flat tire. On February 13, the defendant drove Mr. White and Jermicia White[2] around town so that Mr. White could run some errands; Mr. White did not have a vehicle of his own. Mr. White gave the defendant $20 to cover the cost of gasoline, and the defendant again saw the large amount of cash Mr. White had.

While Mr. White was shopping in a clothing store, the defendant pressured Mr. White to hurry. Later, when the defendant stopped for gas, Mr. White became concerned because both the defendant and Ms. White stepped out of the vehicle. The defendant and Ms. White were talking and "staring" at Mr. White, and the defendant placed calls from his cellular telephone. Feeling uncomfortable, Mr. White took most of the $1,800 from his pocket and hid the money in one of his socks. While en route to Mr. White's residence, Mr. White asked the defendant to stop at the defendant's house so that the defendant could retrieve money he owed Mr. White, but the defendant refused to stop, insisting that he would reimburse Mr. White later.

When the trio arrived at Mr. White's residence around 9:00 p.m., Mr. White got out of the vehicle and was immediately accosted by a man later identified as Mr. Taylor, who placed a gun to Mr. White's chest and demanded that Mr. White "give him everything out of [his] pockets." Mr. White threw his hands in the air, and Mr. Taylor searched Mr. White, stealing his wallet, cellular telephone, and the two dollar bills Mr. White left in his pocket. Mr. Taylor then demanded to know "where's the rest of the money at." When Mr. Taylor began rummaging through Mr. White's backpack in the back seat of the vehicle, Mr. White attempted to wrest the handgun away from Mr. Taylor. During the struggle, shots were fired, and one bullet grazed Mr. White's hand. Mr. White wrestled Mr. Taylor to the ground and was successful in his efforts to take control of the handgun, which he tossed aside. Mr. White also managed to retrieve the items Mr. Taylor had stolen from him, with the exception of Mr. White's automated teller machine card, which was later found with Mr. Taylor. After retrieving his property, Mr. White released Mr. Taylor, and Mr. Taylor escaped. Throughout the fracas, the defendant "just st[ood] there," and Ms. White ran away from the scene. Mr. White never saw Mr. Taylor point his gun at the defendant or Ms. White.

Mr. White's roommate, Jamar Hayes, heard the gunshots and ran outside. Mr. White yelled for Mr. Hayes to call the police, and Mr. Hayes returned to the house to call 9-1-1. Although he did not know Mr. Taylor, Mr. Hayes noticed Mr. Taylor sitting in a neighbor's front yard approximately one hour before the attack on Mr. White. Gwendolyn Collier, Mr. White's neighbor, also heard gunshots on February 13. When she stepped outside, she saw Mr. White wrestling with another man on the ground, and

---

[2] Mr. White is no relation to Jermicia White.

she heard Mr. White yelling for someone to call the police. Ms. Collier also noticed the defendant not "doing anything but ducking and dodging."

Law enforcement officers arrived on the scene a short time later and spoke with both Mr. White and the defendant. Less than an hour later, Mr. Taylor was apprehended and was positively identified by Mr. White as the man who had robbed him. Mr. White's automated teller machine card was found in Mr. Taylor's possession.

Based on Mr. White's suspicions and the defendant's unusually calm demeanor, officers asked the defendant to accompany them to the police station for further questioning. The defendant agreed, and although he initially denied any involvement in the crime, he later admitted to arranging the robbery and expecting to receive a portion of the money stolen.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant chose not to testify and presented no proof.

Based on this evidence, the jury convicted the defendant as charged of aggravated robbery. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of eight years' incarceration to be served at 85 percent by operation of law. *See* T.C.A. § 40-35-501(k)(1).

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends only that the trial court erred by refusing to suppress the incriminating statements he made to law enforcement officers. Specifically, the defendant claims that his confession was coerced and therefore should have been suppressed.

The sole basis of the defendant's motion to suppress was law enforcement officers' alleged failure to properly advise him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The motion did not include a component of coercion. Following a suppression hearing, at which Metropolitan Police Department ("Metro") Detectives Matthew Chapman and James Robert Slusser and the defendant all testified, the trial court found as follows:

> Well, let's first talk about Officer Chapman. Officer Chapman was called to the scene. It was originally a shots fired call, and then it turned into a robbery call when he got there. They were interviewing the defendant as well as the victim as if they – interviewing the defendant as if he had

been a victim. And so the questions related to who was it, the description, all that, none of that would be requiring any [*Miranda*] rights. He may have become suspicious because he had talked to Mr. White and then the business about the [defendant's stolen] cell phone did not match up. But he certainly wasn't in custody at that time. And clearly the – there was nothing about that that was ususual in the sense of Officer Chapman just doing his job. Then after the other defendant, Mr. Taylor, was taken into custody – and we heard about that when we did the deposition about how that occurred. They are then – according to the police, according to Officer Slusser, when he got there it was pretty much the same kind of thing. But he asked the defendant if he wanted to come down and sort of clear up some of this I guess, and he said he would.

Also there was [Ms. White]. They got [Ms. White] there, and they interviewed her before they interviewed the defendant. So we have – and he did not interview the defendant until after that. That's when he read him his rights. But he didn't talk to him prior to that. So there's really – even if you were to argue that he was in custody, he was read his rights. Officer Chapman didn't – he wasn't in custody at that time at all. So I'm not going to find that this is a violation of [*Miranda*], mainly because he was Mirandized. And we have the document to prove that he signed the waiver. So I'm going to deny your motion to suppress.

The defendant filed no additional motions to suppress.

The Rules of Criminal Procedure mandate that a motion to suppress "must be raised before trial." Tenn. R. Crim. P. 12(b)(2)(C). Although the defendant did file a pre-trial motion to suppress his statement to law enforcement officers, he based his motion not on the issue of coercion but on a failure to properly advise him of his *Miranda* rights; accordingly, the issue of a coerced confession was never properly before the trial court. The defendant's failure to present this claim bars our consideration of the claim on appeal. *See State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). The defendant claimed in his motion for judgment of acquittal at the close of the State's proof at trial that the defendant's "statement was made under duress," and, in his motion for new trial, the defendant referenced "coerced statements." However, the defendant failed to present the

issue of coercion *before trial*, and thus, the issue is waived. *See* Tenn. R. Crim. P. 12(f)(1).

Moreover, even if the defendant had properly preserved the issue of coercion on appeal, we conclude that the record does not support the defendant's claim.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[3]

---

[3]  This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

In the instant case, the defendant agreed to accompany law enforcement officers to the police station for further questioning. The defendant, who was attending college at the time of the crime, was provided with *Miranda* warnings and signed a waiver of his rights. The record reflects that the total time of the defendant's interrogation was approximately one hour and that he waited in the interview room for one to two hours prior to his interview while officers interviewed Ms. White. During that pre-interrogation period, the interview room was unlocked, the defendant was not handcuffed, and he was free to leave at any time. Although officers questioned the defendant about his involvement in other robberies, the officers denied threatening to prosecute the defendant for those crimes if he did not confess to his involvement in the aggravated robbery of Mr. White. Detective Slusser did tell the defendant that he would allow the defendant to go home that night if the defendant was honest with him – and the defendant was, in fact, allowed to leave after giving his statement – but Detective Slusser also told the defendant that "if the time does come that you have to get locked up, as long as you stay in contact with me, I'll let you know when that comes so you can turn yourself in." When looking at the totality of the circumstances, it is clear that the detective's statements could not be considered coercive or enforceable promises of leniency.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE