IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2016

**TINA GARRETT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Fentress County**
**No. 2014-CR-13     E. Shayne Sexton, Judge**
_____

**No. M2015-01659-CCA-R3-PC – Filed September 22, 2016**
_____

In June 2013, the Petitioner, Tina Garrett, entered a "best interests" guilty plea to first degree murder in exchange for a life sentence. She subsequently filed a petition for post-conviction relief alleging, among other things, that she received ineffective assistance of counsel and that her plea was unknowing and involuntary. Following a hearing on the petition, the post-conviction court denied relief. After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Ivy J. Gardner, Crossville, Tennessee, for the appellant, Tina Garrett.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; and Jared R. Effler, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This appeal arises from the dismissal of a petition for post-conviction relief, challenging the Petitioner's Fentress County conviction for first degree murder in connection with the death of her former husband, Jonathan Garrett ("the victim"). On October 28, 2011, the Petitioner called Fentress County 911 to report that an unknown intruder had entered the victim's home and assaulted the victim with a knife, killing him. The Petitioner provided a written statement to investigators with the Tennessee Bureau of

Investigation ("TBI"), in which she claimed she was asleep when the attack began. She stated that, when she awoke, she saw a "tall, stocky figure" retreating down a hallway.

Early in the investigation, Robert Worley and Brandy Hubbard informed authorities that Mr. Worley's roommate, Gilbert Corson, had an "on and off again girlfriend from Fentress County named []Tina Garrett" and that he had shown them a cut on his hand on the day of the victim's murder. Investigators obtained consent to search the residence Mr. Worley shared with Mr. Corson and collected a cell phone, a computer, a pair of brown boots, and a knife that was found under the mattress of Mr. Corson's bed. Ms. Hubbard also turned over clothing "covered in blood" that she found at the residence. TBI agents subsequently interviewed Mr. Corson, who admitted that he and the Petitioner had discussed a way for the Petitioner "to be free" from the victim. He further admitted that he entered the victim's residence with a knife on the morning of the attack and that he and the Petitioner communicated via text message just prior to his attacking the victim. Mr. Corson said that the Petitioner sent him photographs of bruises on one of her children, and the Petitioner claimed that the victim was abusing the child. Mr. Corson explained that the photographs caused him "extreme emotional turmoil" due to his own past history of abuse.

Investigators subsequently issued a subpoena for the cell phone records of both Mr. Corson and the Petitioner and discovered multiple text messages between the Petitioner and Mr. Corson leading up to and following the victim's murder. Although the Petitioner initially denied having any involvement in the murder, the Petitioner later admitted that she knew the identity of the individual who had killed the victim. She identified Mr. Corson as the assailant but insisted that she attempted to prevent the offense by telling Mr. Corson not to go through with it.

*Plea Submission Hearing*

At the Petitioner's plea submission hearing, the trial court advised the Petitioner of the nature of the charge to which the plea was offered, her right to plead not guilty, her right to a jury trial, her right to confront and cross-examine witnesses, and her right to be protected from self-incrimination. When asked whether she understood that she would be giving up those rights by entering a plea, the Petitioner stated that she did. The trial court further advised the Petitioner that the punishment for first degree murder was life imprisonment, and that, by pleading guilty, she waived the right to a trial and sentencing hearing.

The Petitioner stated that she could read and write and had completed twelfth grade. She denied being under the influence of alcohol or drugs and denied that she had been forced or threatened to enter the plea agreement. She stated that trial counsel had

investigated the facts and law applicable to the case and acknowledged that trial counsel had filed numerous motions on her behalf. The Petitioner affirmed that she was satisfied with trial counsel's representation and that she waived her right to trial. After hearing the State's evidence against the Petitioner, the trial court found that the Petitioner had made a knowing and intelligent waiver of her right to trial and accepted the "best interests" plea. The trial court stated that it found the Petitioner "guilty beyond a reasonable doubt of first degree murder and impose[d] the sentence of life imprisonment as a violent one hundred percent (100%) offender."

*Post-Conviction Proceedings*

The Petitioner subsequently filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel, but no amended petition was filed. At a hearing on the petition, trial counsel testified that he was appointed to represent the Petitioner in January 2012 on charges of first degree murder and conspiracy. Trial counsel stated that he had practiced law since 1995 and estimated that ninety to ninety-five percent of his practice was criminal defense. He further stated that he had tried a first degree murder case prior to his appointment to the Petitioner's case. Trial counsel met with the Petitioner at arraignment and spoke to her about the severity of her charges. He explained that the State filed a notice of intent to seek life without parole based upon the murder being "especially heinous, atrocious, or cruel."

Trial counsel filed a request for discovery, including a request for discovery of the Department of Children Services ("DCS") records, "which were voluminous[.]" Trial counsel testified that he requested records from DCS based upon information from the Petitioner that the victim abused her and their children and that DCS investigated the allegations of abuse. Upon review of the records, however, counsel learned that DCS closed the case without removal of the children or the State's picking up the case for prosecution. Trial counsel stated that, although discovery contained prior police reports regarding domestic violence, there was physical abuse "both ways." After viewing the DVD's provided in discovery and reading through the records, trial counsel provided the Petitioner with a copy of discovery and went over all of the documents with the Petitioner "[m]any times."

Trial counsel testified that, following his receiving discovery, the State presented counsel with a settlement offer, which was "basically plead to first degree murder or go to trial." The State offered the Petitioner a life sentence in exchange for her plea. Trial counsel recalled that he discussed the offer with the Petitioner, noting that her options were "very limited." Trial counsel explained that the offer was made "fairly early," and he was initially "under the impression that a life sentence was [fifty-one] years but that there would be an opportunity for parole after the service of a certain period of time[.]"

He "advised [the Petitioner] of that, but she still . . . was not willing to agree to that." Trial counsel stated that, after having more time to review the State's offer, he determined that the Petitioner's sentence "would be [fifty-one] years . . . of service of the sentence and parole would come after the service of the sentence[.]" Trial counsel advised the Petitioner that his initial advice about the plea offer was incorrect, and he explained to her that "if you take this plea, you'll serve at least [fifty-one] years." He stated that he made a counter-offer, but the State rejected it.

Trial counsel recalled that he visited the Petitioner in the Scott County jail twelve times from the time of his appointment until just before the Petitioner's plea. They discussed the Petitioner's constitutional rights and that she would waive those rights if she agreed to accept the State's offer. Trial counsel explained the difference between a sentence of life and a sentence of life without parole. He informed the Petitioner that her chance of being convicted of a lesser included offense or a not-guilty verdict after trial was "practically nil" based upon the evidence the State had accumulated. Trial counsel testified that the State's evidence was "simply overwhelming" and included many pages of text messages sent between the Petitioner and Mr. Corson. He stated that the evidence "destroyed [his] theory of the case," which was that Mr. Corson manipulated the Petitioner into committing the crime. Trial counsel advised the Petitioner that, with a life sentence, she would still have a "hope of eventual release." Trial counsel testified that he discussed "all aspects" of the Petitioner's "best interests" plea before she entered the plea and that he believed she made an informed decision. He stated that the Petitioner understood that the agreement she was entering into meant that she would serve fifty-one calendar years before she was eligible for release.

On cross-examination, trial counsel stated that he filed multiple pretrial motions, including a motion for change of venue which the trial court denied. Trial counsel also filed a pretrial motion for an evaluation of the Petitioner's state of mind at the time of the offense and her competency to stand trial. Although trial counsel secured funding for a mental health expert, the doctor found that the Petitioner was "[f]ully competent" to stand trial. Trial counsel stated that he also filed a motion to prevent the State from admitting nude photographs that the Petitioner sent Mr. Corson on the day of the victim's murder.

Trial counsel testified that, after several hearings on his pretrial motions, he knew that the evidence against the Petitioner was going to be "very graphic and damning." He explained that the evidence established that the Petitioner was staying at the victim's home at the time of the murder and that she let Mr. Corson into the residence while the victim and their children were asleep. Although the Petitioner called 911 to report the crime, she lied about what had happened, reporting that an unknown intruder had entered the residence and harmed the victim. The Petitioner later retracted the statement and admitted to law enforcement that she had been involved in the crime. Trial counsel

testified that the evidence also showed that the Petitioner and Mr. Corson were sending text messages to one another minutes before the victim was murdered. One message discussed the Petitioner leaving a door open. In another message, Mr. Corson asked the Petitioner whether he should use a "G" or a "K," and the Petitioner responded that he should use a "K" because it would be quieter. Trial counsel stated that the victim's autopsy report showed that the victim sustained multiple stab wounds to the neck and chest. He further stated that, after the murder, the Petitioner sent a text message to Mr. Corson, telling him that they needed to delete their text messages.

Regarding Mr. Corson, trial counsel testified that Mr. Corson "rolled on [the Petitioner]," pled guilty, and agreed to testify against the Petitioner. Trial counsel stated that the Petitioner understood that, if she went to trial, Mr. Corson was going to testify against her and that his testimony would be "devastating." Trial counsel stated he believed that the Petitioner would receive a sentence of life without parole if she was convicted at trial based upon the circumstances of the offense.

The Petitioner testified that she was charged with first degree murder and conspiracy, along Mr. Corson, whom the Petitioner was dating before the victim's murder. The Petitioner stated that trial counsel explained the charges and told her that the charges were "pretty bad." Trial counsel met with her multiple times and went over "a lot of paperwork" with her. The Petitioner stated that trial counsel attempted to answer all of her questions. Trial counsel provided her with the transcript of the 911 call and advised her that the State was seeking life without parole. Additionally, trial counsel informed her that Mr. Corson pleaded guilty and agreed to testify against her. She explained that Mr. Corson was "throwing everything on [her] and not taking responsibility for anything[.]"

Regarding the State's plea offer, the Petitioner testified that trial counsel told her that a sentence of life without parole meant that she would never get out of prison but that, with a life sentence, she would get out after the service of twenty-five years. The Petitioner explained that, on the day she signed her plea paperwork, trial counsel told her "you'll get [twenty-five] years and get to see your kids." She stated, however, that after she signed the plea trial counsel told her that she would actually have to serve eighty years. The Petitioner did not learn until she got to prison that she had to serve fifty-one years before release on a life sentence.

On cross-examination, the Petitioner testified that trial counsel advised her that it would be in her best interest to accept the State's plea offer because it "probably wouldn't turn out so good if [she] went to trial." She stated that she entered a "best interests" plea because she agreed with trial counsel's assessment of the case. She agreed that she lied during the 911 call, and she stated that she did not want a trial wherein the

jurors would see the text messages sent between her and Mr. Corson. The Petitioner acknowledged that, during the plea colloquy, she told the trial court that she was satisfied with trial counsel's representation. However, she stated that she felt pressured by trial counsel into taking the plea. She recalled that trial counsel repeatedly said "it would be in [her] best interest to take this plea, [she] would do [twenty-five] years and get to see [her] kids." Although trial counsel said that the State's offer was "very firm" and that the State was "not gonna [sic] budge[,]" the Petitioner maintained that trial counsel "could have tried harder to get a different plea." The Petitioner stated that she wanted the chance to receive a lesser sentence.

At the conclusion of the hearing, the post-conviction court noted that it had reviewed the record, testimony, and arguments of counsel. Finding trial counsel's testimony credible, the post-conviction court noted that trial counsel testified about the length of his preparation to ready the case for trial and about his conversations with the Petitioner, in which he prepared her for an adverse outcome. The post-conviction court stated that it recalled the pretrial hearings leading up to the Petitioner's plea and found that the evidence was "very, very strong, very hard against the [Petitioner]." The court found that trial counsel made strategic decisions that would have "fleshed out the better sides . . . of [the Petitioner's] case, and there were none." The court determined that the Petitioner failed to show ineffectiveness on the part of trial counsel based upon counsel's preparation and the resolution of the case in the Petitioner's "best interests" plea, and the court entered an order dismissing the petition. This timely appeal followed.

## II. Analysis

On appeal, the Petitioner asserts that she received ineffective assistance of counsel based upon trial counsel's erroneous advice that a life sentence meant that she would be eligible for parole after the service of twenty-five years. The Petitioner avers that she based her decision to enter the plea agreement on this faulty understanding of a life sentence and that she would have "either gone to trial or made a more acceptable agreement" if she had known that she would not be eligible for parole after the service of twenty-five years. Additionally, the Petitioner asserts that her plea was unknowing and involuntary based upon the trial court's failure to ensure, during the plea colloquy, that the Petitioner understood when she would be eligible for release under a life sentence.

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound

by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this Court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for a court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985); Don Allen Rodgers v. State, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Crim. App. Apr. 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. See Hill, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." Id. at 59.

Unknowing and Involuntary Guilty Plea

Counsel's effectiveness may also implicate the requirement that a plea must be entered knowingly and voluntarily, i.e., that the petitioner made the choice to plead guilty after being made aware of the significant consequences of such a plea. State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard as announced in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). Don Allen Rodgers, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." Boykin, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea . . . ." Mackey, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of

- 8 -

what the plea connotes and of its consequence." Boykin, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904; Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. Boykin, 395 U.S. at 244.

Statements made by a petitioner, the defense counsel, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conclusory allegations unsupported by specifics." Id. at 74.

In this case, the Petitioner maintains that trial counsel erroneously advised her that she would be released after the service of twenty-five years based upon her life sentence. This court has previously explained that "a sentence of life in prison entitles a defendant to be released, as opposed to paroled, after serving 100% of sixty years less any eligible credits, so long as they do not operate to reduce the sentence by more than 15%, or nine years, which would result in a total sentence of fifty-one years." Kermit Penley v. State, No. E2004-00129-CCA-R3-PC, 2004 WL 2439287, at *3 (Tenn. Crim. App. Nov. 1, 2004), perm. app. denied (Tenn. Feb. 28, 2005); see also Tenn. Code Ann. § 40-35-501(h)(1) and (i)(1) (2010). Trial counsel testified that he initially told the Petitioner that a life sentence was fifty-one years and that she would be eligible for parole after the service of a certain amount of time. However, trial counsel stated that, after having additional time to review the State's offer, he informed the Petitioner that his initial advice was incorrect and that a life sentence would require the Petitioner to serve a minimum of fifty-one years before she was eligible for release. Trial counsel further testified that, before the plea, the Petitioner understood that she would serve at least fifty-one years under the agreement. The post-conviction court accredited trial counsel's testimony, and this Court must defer to the post-conviction court's credibility finding and its resolution of factual issues. Fields, 40 S.W.3d at 456. Accordingly, the Petitioner has

failed to establish deficient performance on the part of trial counsel based upon his advice regarding her eligibility for release on a life sentence.

Regarding the Petitioner's claim that her plea was unknowing and involuntary based upon the trial court's failure to ensure that she understood release eligibility for a life sentence during the plea colloquy, we note that the Petitioner did not raise this claim in her petition, and the post-conviction court made no findings regarding the claim. Thus, the Petitioner has waived this ground for relief. State v. Johnson, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived.").

Waiver notwithstanding, the plea submission hearing transcript shows that the trial court conducted a thorough Tennessee Rule of Criminal Procedure 11(b) colloquy with the Petitioner and accepted the Petitioner's plea as knowingly and voluntarily made. The trial court properly advised the Petitioner that she was to serve her sentence as a "violent one hundred percent offender" and that she would be eligible for release "at the appropriate time." Although the Petitioner asserts that the trial court should have explained release eligibility on a life sentence, it is clear that the trial court complied with the requirements of Rule 11. It was the duty of trial counsel to inform the Petitioner that she would serve a minimum of fifty-one years on a life sentence, and trial counsel's accredited testimony was that he explained this to the Petitioner. The record further shows that the Petitioner had the opportunity to confer with experienced trial counsel multiple times, and counsel properly advised the Petitioner about the charges against her and the range of possible penalties. Finally, the Petitioner avoided a potentially greater sentence of life without parole by entering her plea.[1] Under these circumstances, the Petitioner's plea was knowingly and voluntarily entered.

### III. Conclusion

In conclusion, we hold that the Petitioner received the effective assistance of counsel and that her plea was knowingly and voluntarily made. We, therefore, affirm the denial of post-conviction relief.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[1] The record reflects that the Petitioner was twenty-eight years old at the time of the offense, and she has been incarcerated since shortly after the murder. Thus, on a life sentence, the Petitioner will not be eligible for release until she is at least seventy-nine years of age.

- 10 -