IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2016 Session

## GALE MARLEEN KRIZKA v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Morgan County**
**No. 8930      E. Eugene Eblen, Judge**
_____

**No. E2015-02243-CCA-R3-PC – Filed January 27, 2017**
_____

Petitioner, Gale Marleen Krizka, appeals from the denial of her petition for post-conviction relief, in which she alleged that her counsel was ineffective for failing to obtain an expert witness, failing to call witnesses, and failing to give an opening statement. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Cashauna C. Lattimore, Knoxville, Tennessee, for the appellant, Gale Marleen Krizka.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Russell Johnson, District Attorney General; and Tiffany Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Procedural history*

Petitioner was convicted of second degree murder for the death of her husband. The facts underlying Petitioner's conviction were summarized by this court on direct appeal:

> On May 31, 2002, a body was located on a secluded embankment in Scott County. The area was commonly used for illegal dumping. A person riding a four-wheeler discovered the body and notified the authorities. The body was clothed in blue underwear-like shorts and had been wrapped in a shawl or blanket along with a black plastic tarp. The

body appeared to have come partially out of the blanket and black plastic tarp when it rolled down the approximately fifty-foot embankment. Both of the items appeared to have been secured around the body by an old, frayed rope. The tarp and blanket contained blood stains from the body. Randy Lewallen, a detective from the Scott County Sheriff's Department, responded to the call.

According to Detective Lewallen, the body was in a moderate state of decomposition. There was maggot activity in the body. The body was removed by the Scott County Rescue Squad and transported to Knoxville for an autopsy.

The autopsy was performed by Sandra K. Elkins, a forensic pathologist. She described the victim as a five[-]foot six[-]inch tall male that weighed 316 pounds. The autopsy revealed that the victim had suffered multiple lacerations to the scalp, multiple skull fractures, and incisions of the right internal jugular vein, right carotid artery, esophagus, and cervical vertebrae. Dr. Elkins opined that the cause of death was blunt force trauma to the head and a stab wound to the neck. There was no blood left in the body, so Dr. Elkins forwarded a liver sample to the Tennessee Bureau of Investigation ("TBI") for completion of a DNA analysis.

At the time that the autopsy was performed, police had not yet identified the victim. In order to assist in their investigation and identification of the victim, the police contacted the local news media. Several Knoxville television stations ran a story about the discovery of the body and a plea was made for public assistance in identification of the body. Investigators were contacted by a person that identified herself as Ann Christopher, the daughter of Richard Krizka, the victim. [Petitioner] is Ms. Christopher's mother.

The police went to Ms. Christopher's place of business in Clinton, Tennessee, where she was shown pictures from the autopsy. Ms. Christopher stated that it looked like the victim and that the shawl located with the body looked like a shawl that belonged to her Aunt Melissa. Ms. Christopher stated that she had last seen the victim late in the afternoon on May 26, 2002. He was driving his motor home down the road by the elementary school. The next day, Memorial Day, [Petitioner] called Ms. Christopher from Wal-Mart around 5:00 p.m. or 6:00 p.m. to tell her that Mr. Krizka had left her a note in which he stated

that he was going to Arkansas to buy some property. This was not uncharacteristic behavior for Mr. Krizka. According to Ms. Christopher, Mr. Krizka "did things like that" and sometimes took off with someone he did not know. However, [Petitioner] was upset because she and Mr. Krizka were supposed to go the next day to start divorce proceedings.

Ms. Christopher went to visit her mother the next day. [Petitioner] was "bleaching" the carpets and the furniture was moved over to one side of the room. Ms. Christopher did not find her mother's actions unusual because the victim was a "slob" who did not bathe regularly and would often track in grease onto the carpet. Additionally, Ms. Christopher explained that "they did have a dog that lived in the house at the time and she'd been in heat" making a "big mess."

After identifying the victim, the police attempted to find [Petitioner]. They located her on June 7, 2002, at Darrell Webster's residence and accompanied her to her own residence where she consented to a search of the home. During the search, Detective Lewallen discovered a boat anchor with an old frayed rope that appeared to match a rope found near the body. Detective Lewallen also noted that the carpet looked like it had been recently cleaned. Detective Lewallen "noted that it abruptly stopped where the carpet goes down the hallway." During the initial visit to the home the officers took a computer, a power cord, some pieces of black plastic, carpet samples, and some branches from the home.

A second [sic] search warrant was executed on June 10, 2002. During the second search the officers were accompanied by members of the TBI Mobile Crime Team Lab. The search revealed "some blood splatters on the walls, or red, brownish stains." The "wooden frame couch" was also flipped over during the search and revealed "red/brownish stains that had run down between the cracks that hadn't been accessible to being cleaned." They were described by Detective Lewallen as "thick, red brownish stains" that were suspected to be blood. There were also "very large, red/brownish stains underneath the carpet and in the pad" that were "massive" in size. The couch cushions also appeared to have been recovered with a different upholstery. During this search, authorities took a cigarette wrapper from [Petitioner]'s vehicle's trunk, a wet vac bucket from the garage, a sample from the couch frame, a sample from the wall behind the couch, a sample from the carpet beneath the couch, and a knife. The samples taken from the couch

- 3 -

frame, the wall, the carpet, and the cigarette wrapper matched the victim's DNA that was obtained from the liver sample. No blood was found on the knife handle. The wet vac test was presumptive for blood, but it could not be determined if the blood was human. Police also transported two vehicles to Nashville for inspection.

[Petitioner] was indicted by the Morgan County Grand Jury for first degree murder on January 21, 2003.

At trial, Ms. Christopher testified that approximately one week prior to [the victim's] disappearance, [Petitioner] told her that the couple was having "a little trouble" and "that one way or another they'd be divorced in a couple of weeks." Ms. Christopher also testified about a statement made by [Petitioner] when she and the victim were "fussing" that she did not consider a "serious threat" on the victim's life. She recalled that [Petitioner] told her once that the victim "had a seafood allergy, and that if there was some way that she could get seafood into his food or something where he wouldn't know it, then, you know, he would have a reaction from that and could possibly die from it." Additionally, Ms. Christopher remembered that [Petitioner] had mentioned a cousin by the name of Charlie Massengill. [Petitioner] "said something about calling him to have something done to [the victim]. But not to kill him, but like bodily injury or something like that." Several years prior to the victim's death, he had gallbladder surgery and a cancer scare. Around this time, [Petitioner] mentioned to Ms. Christopher that if the victim were to die, [Petitioner] "would be well taken care of" with the victim's pension.

Thomas Hull also testified at trial. Mr. Hull is [Petitioner]'s former boyfriend and father of Ms. Christopher. Mr. Hull and [Petitioner] were out of touch for a number of years but reconnected in the year 2000. During one of their visits, [Petitioner] advised Mr. Hull that the victim "would not give [Petitioner] a divorce. And if he was to meet a death she would inherit some money and a retirement." Mr. Hull told [Petitioner] a story about a time while he was in military service in Vietnam and he had to decapitate a Vietnamese guard to get away from capture. [Petitioner] responded by saying that "she thought that would be the coolest thing in the world, to kill somebody, and cut their head off, and them knowing it was going to happen." [Petitioner] also told Mr. Hull that [the victim] was allergic to seafood. [Petitioner] asked Mr. Hull's opinion of "cooking seafood, boiling it or something and putting

- 4 -

it in some kind of food for the iodine, . . . , cause he was allergic to that. And doing away with him like that, I guess." As a result of those conversations, Mr. Hull did not see or speak with [Petitioner] again.

At the conclusion of the jury trial, the trial court recognized that the case was based on circumstantial evidence and dismissed the first degree murder charge, determining that "at this point the jury would have to speculate to find premeditation." The trial court felt that with regard to the lesser included offenses, there was enough proof for it to be a "jury question."

The jury ultimately convicted [Petitioner] of second degree murder. As a result, the trial court sentenced [Petitioner] to twenty-two years['] incarceration. [Petitioner] filed a timely notice of appeal seeking a review of her conviction.

*State v. Gale Marleen Krizka*, No. E2007-02465-CCA-R3-CD, 2009 WL 856338, at \*1 (Tenn. Crim. App. at Knoxville, Mar. 26, 2009), *perm. app. denied* (Tenn., Aug. 17, 2009) (footnotes omitted).

### *Post-conviction hearing*

Trial counsel testified that he was appointed to represent Petitioner at trial. He testified that he did not interview Petitioner, but that someone in his office interviewed her. He did not know how many times she was interviewed. Counsel testified that an investigator employed by the Public Defender's Office, investigated Petitioner's case. Trial counsel and the investigator interviewed witnesses in preparation for trial, but trial counsel did not call any witnesses to testify at trial. Trial counsel testified that he spoke to Randy Lewallen, a Scott County detective, about using an entomologist to determine the victim's time of death. Trial counsel testified that he did not consult with an independent expert to determine the time of death because the medical examiner had removed the maggots from the body. Trial counsel testified that the medical examiner did not prepare any reports from which an entomologist could make an independent determination.

Trial counsel estimated that his office handled approximately 100 cases each year, and there were two or three homicide cases pending at any particular time. He testified that his co-counsel "concentrated only on these kinds of cases[,]" and co-counsel did most of the preparation in Petitioner's case. Trial counsel handled the trial and trial strategy.

On cross-examination, trial counsel testified that he had been an attorney for almost 31 years. Trial counsel estimated that he had tried "probably a dozen" murder cases. Trial counsel testified that Petitioner's trial "went about as well as it possibly could[.]" He testified that there was nothing he would have done differently in Petitioner's case. He testified that the State's expert witness "wasn't very good[,]" and through cross-examination, he was able to undermine the blood spatter analysis.

Trial counsel did not answer why he did not present defenses that Petitioner wanted him to present at trial. He testified that it was "a privileged matter." He testified that he did not believe any of those defenses would have changed the outcome of the trial. Trial counsel testified that it was customary in that jurisdiction not to give an opening statement, and he did not believe his waiver of an opening statement prejudiced Petitioner. Trial counsel consulted with an expert witness who was the "head of the crime lab in Albuquerque, New Mexico," but that person did not want to testify at Petitioner's trial.

In a written order denying relief, the post-conviction court found that Petitioner failed to prove that trial counsel's performance was deficient and failed to prove that Petitioner had suffered any prejudice as a result of counsel's alleged deficient performance.

*Analysis*

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that

counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id*. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id*. (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

Petitioner contends that trial counsel was ineffective for failing to present an expert or other witnesses. In her brief, Petitioner asserts that, "[i]t is hard to believe that with all of the preparation not a single witness could be found to testify favorably for [Petitioner]." When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of her defense, she must present these witnesses at the post-conviction hearing; otherwise, she cannot establish that the witness was discoverable or that counsel's failure to present the witness prejudiced her in any way. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner failed to present the testimony of an expert or any other witness who would have provided favorable testimony at trial. In addition, Petitioner has not even provided in her brief any names of witnesses who trial counsel should have presented at trial. Accordingly, this supports the fact that there are no witnesses known who could have testified favorably for Petitioner.

Petitioner also contends that trial counsel was ineffective for waiving an opening statement. Trial counsel testified that opening statements were often waived in the jurisdiction, and that the State also waived opening statement at Petitioner's trial. Trial counsel testified that it was his trial strategy to use voir dire to frame the case for the jury. In determining whether counsel's performance was deficient, it is not the role of this court to second-guess reasonably based trial strategy or tactics. *See Adkins*, 911 S.W.2d at 347. Petitioner failed to present any evidence at the post-conviction hearing that trial counsel's decision not to make an opening statement was deficient or that it affected the outcome of the trial.

Finally, Petitioner contends that trial counsel was ineffective for failing to challenge the State's alleged failure to preserve evidence and by failing to cross-examine the State's witness, Dr. Elkins, regarding insect activity on the victim's body. Petitioner failed, however, to raise this issue in her petition for post-conviction relief or at the post-conviction hearing. "Issues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996). Moreover, a petitioner may not present on appeal an issue he failed to include in his post-conviction petition. *Cone v. State*, 747 S.W.2d 353, 356 (Tenn. Crim. App. 1987).

## CONCLUSION

We hold that Petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial. Petitioner failed to establish that she was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

- 8 -