IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 10, 2020

## STATE OF TENNESSEE v. DAVID JOHNSON

**Appeal from the Criminal Court for Shelby County**
**No. 16-00393      Lee V. Coffee, Judge**

_____

### No. W2019-01133-CCA-R3-CD

_____

On October 12, 2018, a Shelby County jury convicted the Defendant, David Johnson, of aggravated rape committed in February 2000, based on DNA evidence linking him to the crime. On appeal, the Defendant asserts that he is entitled to have the conviction reversed and dismissed because he was not timely indicted. He also argues that the State failed to establish the chain of custody of the DNA evidence. We conclude that the Defendant was timely indicted through a "John Doe" indictment and that the trial court did not abuse its discretion in finding that the chain of custody was adequately established for the DNA evidence. Accordingly, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Shae Atkinson (at hearing on remand and on appeal),[1] Robert Golder (on appeal), Claiborne Ferguson (at trial), and Hayden Lawyer (at the motion for a new trial), Memphis, Tennessee, for the appellant, David Johnson.

_____

[1] The trial court initially appointed Mr. Atkinson to represent the Defendant on appeal, but Mr. Golder filed a motion for substitution of appellate counsel and filed the Defendant's appellate brief. The Defendant filed various motions seeking to change his representation, and Mr. Golder filed a motion to withdraw. This court denied the motions and on November 23, 2021, entered an order declaring that Mr. Golder remained counsel of record. On remand, the trial court held a hearing, during which it appointed Mr. Atkinson to represent the Defendant after observing that Mr. Golder was working in another county as a public defender. This court subsequently appointed Mr. Atkinson to represent the Defendant for the remainder of the proceedings on appeal.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Cavett Ostner and Dru Carpenter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The victim was raped at knifepoint by an intruder in the early morning hours of February 14, 2000. Although DNA evidence was collected, the evidence sat in a storage facility and was not tested until years after the crime. At trial, the State presented evidence that the DNA recovered from the victim was linked to the Defendant, while the Defendant argued that the DNA evidence was not reliable.

In February 2000, the victim and her children shared a ground-floor apartment with the victim's twin sister. The victim's sister's bedroom had bars on the window, but the victim's bedroom, where she slept alone, did not. The victim testified that she spent the evening of February 13, 2000, with her boyfriend and that she had consensual intercourse with him. She returned to the apartment around 1:00 a.m. on February 14, 2000, took a shower, and went to bed. At around 2:30 or 3:00 a.m., the victim turned over and saw a strange man in the window. She turned on the light, and the man told her that he had a gun and instructed her to turn the light off. The victim complied, and the man came through the window. The man put a butcher knife to the victim's throat, told her to turn onto her stomach, cut her underwear off with the knife, and penetrated her vaginally while pressing the knife to her back. He then penetrated her orally. The victim testified she could not see his face and could not tell what race the intruder was but that he smelled like "a panhandler on the street." The man fled out the window, and the victim reported the rape to her sister, who called the police. The victim's sister confirmed that the victim woke her up, crying and shaking, and reported she had been raped.

The victim was examined at the Memphis Sexual Assault Resource Center ("MSARC"), and evidence was collected. Prior to the admission of the DNA evidence, the Defendant objected on the basis that the State would not be able to establish the chain of custody. The State reviewed its anticipated proof on the issue, and the trial court ruled that, "subject to the … State's … establishing a beginning and the end and no indicia of tampering or substitution," it would allow the evidence to be admitted.

Ms. Sally DiScenza, an expert in sexual assault examination, testified that she collected evidence by swabbing the victim for DNA. She testified she would normally

allow a victim to give a narrative and then specifically ask whether there was also an oral or anal assault. She could not state whether she had done so in this case, and the victim's medical records indicated there was no oral assault. Ms. DiScenza sealed the evidence she collected from the victim and put it into a locked storage area at the MSARC. At trial, she identified the victim's sexual assault kit, noting that she had signed and sealed the kit at the time the evidence was collected.

Mr. Brian Smith, who was employed at the MSARC in February 2000, testified that he transported the evidence to the Memphis Police Department. Mr. Smith had a key to the lockbox in the nurse's station of the MSARC. He identified his signature on the evidence collected by Ms. DiScenza and the time and date in 2000 that he transported it. He testified that he transferred the evidence to the north precinct of the Memphis Police Department on Old Allen Road, where it was placed in a locked, temperature-regulated room. He did not know what happened to the evidence after he placed it there.

Officer Thomas Smith took a statement from the victim at the MSARC, and the victim told him that she would not be able to identify her assailant's face. Officer Smith accordingly did not show her a photographic lineup. Officer Smith stated that the victim had described the knife as a steak knife. Officer Carl Sanford collected fingerprints from the scene and also collected and photographed a pair of women's underwear found near the bed. Officer Smith testified that, while fingerprints were collected from the scene, none of the fingerprints were of value. Accordingly, the case was closed as a "dead end."

The victim did not hear anything further about the case until Sergeant Israel Taylor contacted her in 2014. Sergeant Taylor had been assigned to investigate cases with untested sexual assault kits. He acknowledged that he was unable to look at the original investigatory file and could only view digital documents related to the case. In the victim's case, a suspect was identified, and Sergeant Taylor met with the victim and showed her a photographic lineup which included the Defendant's photograph. The victim reiterated that she had not seen her assailant's face, and she could not identify any of the men in the lineup as the assailant. The victim told Sergeant Taylor that she had never had consensual sex with any of the men in the photographic lineup. The victim's sister likewise testified that she had met the victim's boyfriend from the time of the assault and that she did not recognize any of the men in the lineup. Sergeant Taylor attempted to locate the victim's boyfriend from the time of the assault, and although he found individuals with the same name in Memphis, he could not locate the correct individual. The victim was not able to provide him with enough information to allow him to locate her prior boyfriend.

The victim acknowledged having initially told police, "Because of the smell, I thought it could have been a white person, but I'm not sure. It could have been a black

person." She acknowledged that she had not told police in 2000 about the oral rape and explained that she was embarrassed to tell. Sergeant Taylor confirmed that the victim was calm but became "uneasy" and "ashamed" when she told him in 2014 about the oral rape. The victim did not recall describing the knife as a steak knife rather than a butcher knife.

Special Agent Lawrence James, an expert in forensic biology with the Tennessee Bureau of Investigation ("TBI"), performed analysis on the evidence collected from the victim. He identified the sexual assault kit through seals, markings, barcodes, his initials, and its unique lab number, 123004135. Special Agent James said that the kit first came into his laboratory on July 16, 2012. The kit was sealed, and there was no evidence of tampering. He testified that if he had seen any evidence of tampering, he would have noted it and stopped the analysis. He stated that, with the exception of two pieces of orange tape that he had added and marked with his initials to reseal the package, it was in the same condition at trial as when he first saw it. Special Agent James's documentation indicated that the package was received on July 16, 2012, from Ms. Amber Garner.

Special Agent James processed the kit in 2012 and found sperm cells on the vaginal swabs collected from the victim. At the time, the TBI required written documentation from the district attorney before conducting further analysis. Accordingly, his January 8, 2013, report noted, "DNA testing will be performed upon request of the District Attorney General and receipt of a proper standard from the consensual sex partner." Special Agent James subsequently received a request for testing, and his documentation indicates that the evidence was received again from Ms. Garner on July 2, 2013. Special Agent James testified that he reopened the kit prior to performing further testing and that all the seals were intact prior to his reopening it. The rape kit included a blood standard from the victim, which exhibited some degradation but was complete enough to compare to the other evidence. Special Agent James analyzed the vaginal swabs collected by Ms. DiScenza and identified a mixture of DNA from at least three individuals, and he was able to create a profile for the dominant contributor, who was a male. He put the profile into a database, and issued a report on January 13, 2014, documenting his findings.

Sergeant Samuel McMinn testified that in 2016, he took a DNA sample from the Defendant and submitted the sample for testing to the TBI. Special Agent James received the sealed sample on August 26, 2016, and he conducted further analysis. Based on his analysis, he concluded that the victim's DNA was consistent with being a minor contributor to the profiles on the vaginal swabs. The Defendant "did match up, or at least was consistent, with the major profile from the vaginal swabs." Special Agent James testified that the probability of a randomly selected individual in the African American population having the same profile was one in 676.6 quintillion, and the probability was

further reduced in other racial populations. He stated that this probability exceeded the world population.

On cross-examination, he agreed that the instrumentation and chemistry of DNA analysis had changed since the time the sample was taken and that DNA analysis was a relatively new field. He agreed that DNA would degrade with heat and humidity. Special Agent James agreed that it would be important to have a standard from a consensual sexual partner to exclude the consensual sexual partner, and he testified he never received DNA from the victim's consensual sexual partner. He agreed that a DNA profile from a sample which contained a mixture of different individuals was not generated entirely by a machine but that he had to make a determination regarding which allele was part of which profile. He also agreed that the alleles identified by the machine could be affected by "stutter," "drop in," or "drop out." Special Agent James observed some degree of degradation in both the victim's blood standard and in the vaginal swabs, and this degradation might have caused lower level contributors to drop out. Nevertheless, he testified that he obtained a "robust profile" from the major contributor and that the major contributor was the Defendant.

The parties entered by stipulation two exhibits for identification. One was a supplement by Ms. Garner showing that she retrieved the evidence from "Old Allen Station" on July 6, 2012, that she released it to the property and evidence room of the Memphis Police Department on July 16, 2012, and that she subsequently transferred it from the property and evidence room to the TBI on the same date. She retrieved the evidence from the TBI and transferred it to the property and evidence room on January 31, 2013, and she resubmitted it to the TBI on July 2, 2013, and retrieved it again on February 10, 2014. The other report was a "Chain of Custody" report showing the same movement of the evidence after it was received by the property and evidence room on July 16, 2012.

The jury found the Defendant guilty of aggravated rape. At the sentencing hearing, the Defendant requested but was denied a continuance for the purpose of obtaining new counsel, noting in particular that he had never been provided the "John Doe" indictment and that the State had not pled facts pertinent to tolling. The parties agreed that the Defendant was a Range I offender. The trial court found as enhancement that the Defendant had a previous history of criminal behavior in addition to the offenses necessary to establish his range. In particular, the Defendant had four prior felonies. Two of them took place in Oklahoma and involved the Defendant entering two separate women's dwellings through unlocked windows. In one of the offenses, he assaulted a sixteen-year-old girl and beat her nineteen-year-old sister when the sister attempted to fend him off. He also had multiple misdemeanor convictions. The trial court sentenced him to the maximum of twenty-five years to be served at one hundred percent.

# Post-Trial Proceedings

The Defendant moved for a new trial, asserting various grounds, including that the State failed to prove the integrity of the DNA evidence, in particular by not introducing evidence regarding the condition of the kit or how the kit was stored and maintained for twelve years and by not establishing the identity of the kit. The Defendant's grounds for a new trial also included allegations that the State's DNA evidence was inaccurate according to a defense expert,[2] that the State "failed to prove the chain of custody," that the statute of limitations had expired, and that the "John Doe" indictment was not served on the Defendant and improperly used DNA coding.

At the hearing on the motion for a new trial, the Defendant introduced as exhibits the laboratory data related to the DNA analysis, noting that his expert relied on the materials and that he received them in discovery. Part of the one-hundred-page analysis packet was a sheet beginning on "Page 2" which followed what was already the second page of Special Agent James's January 2014 report. The unsigned narrative, which appears to have been initialed by Special Agent James, recites that the author became aware of an issue in an unrelated case in which evidence was reported as having been submitted by the Shelby County District Attorney General's office on December 13, 2012, although the evidence was actually in the TBI vault at the time. The author of the partial report reviewed other cases in which evidence was purportedly submitted by the same investigator on December 13, 2012. Evidence in one unrelated case was actually submitted on December 13, 2012. Regarding the case at bar, the report narrative states that "123004135 was actually in my possession and being worked on 12/13/12. So the evidence transfer in LIMS was clearly erroneous." The narrative noted that two amended reports were issued in the Defendant's case. The January 13, 2014, report states, "This report[] is an amended version of the Serology/DNA report originally issued 12/19/13. It has been amended to reflect accurate chain of custody." The Defendant did not present any argument at the hearing on the motion for a new trial related to the "Page 2" partial report.

The trial court ruled that the Defendant was not entitled to relief based on the issues raised in the motion for a new trial. In particular, it found that the rape kit was sealed and showed no evidence of tampering, that the DNA evidence was described as "robust" by the expert, and that the indictment charging the Defendant with aggravated rape was a superseding indictment. The trial court stated that no motion was filed to

---

[2] At the hearing, the parties mentioned an amended motion filed April 25, 2019, which included an affidavit. The amended motion in the record was filed on April 16, 2019, and no affidavit is included in the record.

dismiss the indictment based on the statute of limitations, and it reviewed the timeliness of the indictment for plain error. [3] It found that the "John Doe" indictment was timely filed and that the State did not have to plead any tolling facts with regard to the statute of limitations. The court found that a "John Doe" indictment cannot be served and that the Defendant was indicted by name pursuant to a superseding indictment after his DNA profile was confirmed as a match for the sperm recovered from the victim. At the hearing, the Defendant personally addressed the court regarding the indictment, stating that he had been trying to obtain a copy for three years, during which time he was "constantly bringing it up in your courtroom, Your Honor, that … nobody [will] give me a copy of it." The court denied the motion for a new trial.[4]

On appeal, the Defendant filed a brief arguing that the statute of limitations had expired because a "John Doe" indictment had never been filed and no tolling facts were alleged, and he asserted that the rape kit was not properly authenticated and the chain of custody not established. On January 30, 2020, after the Defendant filed his brief, the trial prosecutor asked the trial court to supplement the appellate record with the "John Doe" indictment, attaching an affidavit which noted that the "John Doe" indictment, number 15-00747, identified the accused by DNA and was returned on February 12, 2015, and that the "John Doe" indictment was superseded by indictment number 16-00393, which identified the Defendant by name and was returned on January 21, 2016. On February 10, 2020, the Assistant Attorney General moved to supplement the record with the "John Doe" indictment. This court granted the motion to supplement.

The Shelby County Clerk subsequently forwarded a certification that the "John Doe" indictment, number 15-00747, "has not been received or not to be found." The State moved for an extension of time, noting that it anticipated that the record would be supplemented with the "John Doe" indictment. On March 24, 2020, the trial court entered a written order to supplement the record, and the clerk subsequently forwarded the trial court's order and the "John Doe" indictment to this court.

The "John Doe" indictment, number 15-00747, was returned on February 12, 2015, and it alleged that "John Doe," TBI case number 1230004135, committed aggravated rape of the victim in the case at bar between February 12 and February 15,

---

[3] The attorney initially representing the Defendant at trial filed a motion to dismiss the indictment based on a due process violation premised on preindictment delay relative to the 2016 superseding indictment, but the record does not reflect any resolution of this motion.

[4] While a written order is not in the appellate record, this court ordered and received a supplemental record with the minute entry showing that the motion was denied. *See State v. Byington*, 284 S.W.3d 220, 223 (Tenn. 2009) (holding that when the record contained a transcript of the denial of the motion for a new trial but no order, the proper procedure was to order supplementation of the record).

2000. The indictment contained the DNA profile of the perpetrator, identifying the loci used and the numerical values associated with the loci. The technical record on appeal contains an indictment returned on January 21, 2016, naming the Defendant in the aggravated rape of the victim committed on February 12, 2000. Prior to trial, the prosecutor asked for an amendment to the 2016 indictment, noting that the 2016 indictment was a "superseding indictment that lists David Johnson," that the correct date range was between February 12 and February 15, 2000, and that "[t]he John Doe warrant that was originally issued had the correct range of dates, February the 12th of 2000, through February the 15th of 2000." Trial counsel informed the court that he did not believe there was a good faith basis to object to the amendment, but the Defendant addressed the court and objected to the amendment of the superseding indictment, putting forth a contention that there was no "John Doe" indictment.

After the trial court clerk supplemented the record with the "John Doe" indictment, the State filed its appellate brief. Subsequently, on May 8, 2020, the Defendant moved to strike the supplemental record containing the "John Doe" indictment, arguing that the indictment "magically appeared," under "suspicious circumstances" and had been improperly included because it had not been made part of the record below or considered by the trial court. The Defendant also argued that the indictment was improperly supplemented because the court's order to supplement the record occurred after an improper ex parte meeting with the prosecutor. The State responded that appellate counsel had been aware of the motion to supplement for three months and had waived any objection. It argued that the record contained numerous references to the "John Doe" indictment and that the indictment was therefore properly includable. The State's response included a declaration by the Assistant District Attorney General (the "ADA") that the trial court had granted a January 2020 motion to supplement, that the clerk's office would not supplement without a written order, and that he obtained a written order in March 2020. The declaration stated that the ADA informed the Defendant's trial counsel that he was seeking to supplement the record, and that trial counsel had no objection. This court ordered and received supplemental briefing on the issue surrounding the supplementation of the record.

In its January 19, 2021, order, this court expressed "deep concern about the Defendant's 'thinly-veiled' allegation that the State fraudulently manufactured the 'John Doe' indictment," noting that the Defendant based the claim in part on the inaccurate assertion that the "John Doe" indictment was never mentioned during trial proceedings. However, because the Defendant's appellate counsel was not given proper notice of the hearing in the trial court regarding supplementation, we remanded the case for a hearing and for the trial court to make written findings regarding whether the "John Doe" indictment in the appellate record accurately reflects what occurred in the trial court.

On November 22, 2021,[5] the trial court held a thorough hearing and entered detailed findings of fact to facilitate this court's appellate review. The trial court found that the delay in holding a hearing was attributable to the Defendant, whose counsel "abandoned him basically," because the trial court "could not get [counsel] to come to court." The court noted that, after further delay during which the Defendant attempted to hire private counsel, the trial court had appointed new counsel for the purpose of holding the hearing.

At the hearing, the ADA who tried the case testified that, after communicating with the Assistant Attorney General assigned to the appeal, he asked the trial court to supplement the record. The ADA submitted an affidavit with his motion to supplement the record, and in the affidavit, he stated that the "John Doe" indictment, which identified the Defendant by DNA, was superseded by an indictment naming the Defendant. The ADA had contacted trial counsel's office before addressing the trial court. The ADA presented the "John Doe" indictment to the trial court for the purpose of supplementing the record. He testified that he retrieved the "John Doe" indictment from the "clerk's jacket," and he identified the "John Doe" indictment, which was made an exhibit to the hearing. The ADA stated that there was never "any question as to the existence of" a "John Doe" indictment. He testified that the State's file number on the "John Doe" indictment was AX1896 and that the number on the superseding indictment was AX1896A, indicating that it superseded the prior indictment. He agreed that the superseding indictment was subsequently amended to reflect the correct dates of the offense.

Ms. Cassaundra Horton, who worked for the criminal court clerk's office, testified that each indictment would come with an indictment number and a number from the District Attorney General's office, and that each case would be assigned a "C" number for the Odyssey data system. If an indictment listing a "John Doe" was superseded by an indictment with a named individual, the indictments would have different numbers. She stated that she searched several times for the "John Doe" indictment, number 15-00747, and that every time she entered the indictment number, "it [would] come[] back no match found." She testified that the system would not retrieve any not-in-custody (or "John Doe") cases and that these cases would only be visible if a superseding case was linked to them. Typically, a superseding case would not be linked to a "John Doe" indictment, and it was not linked in this case. The cases were linked only by the number assigned by the District Attorney General's office. She stated that while the "John Doe" indictment would not be accessible on the computer system, that did not mean that the indictment did not exist.

---

[5] This court filed an order on the day after the hearing, November 23, 2021, noting that no supplement had been received and ordering the trial court to update this court on the status of the remand.

In order to clarify the record to facilitate appellate review, the trial court conducted a thorough analysis of the issue and made specific findings of fact. Regarding the clerk's initial certification that the "John Doe" indictment had "not been received or [was] not to be found," the trial court found that statute prohibited an indictment returned against a person not in custody from being inspected by any person except the judge, clerk of the court, and the district attorney general until the defendant had been arrested. *See* T.C.A. §§ 40-13-111, -112; *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996) (noting that a sealed indictment has the effect of formally charging a defendant but "is not subject to inspection by, or disclosure to, the public until the defendant is arrested or makes bail"). The court found that in this case, the "John Doe" indictment was never served on the Defendant because once his identity was confirmed through DNA analysis, a superseding indictment was issued. The Defendant was ultimately arrested and served with the superseding warrant. The court found that because the "John Doe" indictment had never been served, the clerk's office could not legally make the document public. The trial court concluded that "[t]he indictment has ***continuously*** been in the custody of the office of the Shelby County Criminal Court Clerk." (Emphasis in the original.) The court found that the indictment should be included in the record and that the supplemental record consisting of the "John Doe" indictment accurately reflected what had occurred in the trial court.

## ANALYSIS

### I. "John Doe" Indictment

The Defendant argues that prosecution was not begun within the limitations period because there was no "John Doe" indictment. He asserts the trial court erred insofar as it denied his claim based on failure to raise the issue prior to trial. He also contends that even if the "John Doe" indictment existed, the superseding indictment was invalid for failing to plead specific facts as to tolling. The State responds that the Defendant was timely indicted through the "John Doe" indictment and through the superseding indictment. The State asserts that the "John Doe" indictment was properly included as a supplement to the record. We conclude that the "John Doe" indictment is properly before this court and that the record reflects that the Defendant was indicted within the statutory limitations period.

### A. Supplementation of the Record

The Defendant moved for this court to strike the supplemental record containing the "John Doe" indictment, asserting that it was not properly includable. He cited to the Rule regarding hearsay to argue that the indictment was not self-authenticating because the circumstances of its preparation indicated a lack of trustworthiness. *See* Tenn. R.

Evid. 803(8) (providing a hearsay exception for public records "[u]nless the source of information or the method or circumstances of preparation indicate lack of trustworthiness"). The State argued that the indictment, as a certified copy of a public record, was self-authenticating and that the trial court had properly ruled on the validity of the indictment. *See* Tenn. R. Evid. 902(4).

Tennessee Rule of Appellate Procedure 24(e) provides:

> If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth. Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive. If necessary, the appellate or trial court may direct that a supplemental record be certified and transmitted.

Tenn. R. App. P. 24(e). However, supplementation should be limited to matters necessary to demonstrate what transpired in the trial court:

> Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.

Tenn. R. App. P. 24(g). Supplementation is not limited to matters introduced into evidence at trial, but may include other matters considered by the trial court. *State v. Housler*, 167 S.W.3d 294, 297 (Tenn. 2005) (concluding that a transcript used during trial was properly includable although it was never introduced as an exhibit); *see State v. Smotherman*, 201 S.W.3d 657, 661 (Tenn. 2006) (the record did not show that the search warrant and affidavit were entered into evidence, but they were properly included in a supplemental record because it appeared that the trial court considered them). Matters not considered below are not properly includable. *State v. Rogers*, 188 S.W.3d 593, 611 (Tenn. 2006) (concluding that sealed records which were part of pretrial discovery but were never before the trial court were not includable in the appellate record).

"[A]bsent extraordinary circumstances, an appellate court does not have the authority to refuse to consider matters that are determined by the trial court judge to be appropriately includable in the record." *Bradshaw v. Daniel*, 854 S.W.2d 865, 869

(Tenn. 1993) (concluding that the appellate court erred in refusing to consider the transcript of the first trial when the trial court had considered that testimony in denying summary judgment). The "dual goals of avoiding technicality and expediting a just resolution of the case on its merits …. are achieved by according deference to the trial court's decision as to which matters are properly includable in the record, thereby avoiding additional litigation on that subject alone." *Housler*, 167 S.W.3d at 296. As we noted in our order remanding the case, the trial court is in the best position to determine which matters are "necessary to provide a fair, accurate, and complete account of the proceedings upon which the appeal is based." *Id.*

Because the parties agreed that the supplementation took place pursuant to a hearing of which the Defendant's appellate counsel had no notice and during which he had no opportunity to be heard, we remanded for the trial court to hold a hearing regarding whether the "John Doe" indictment was properly includable in the record. The trial court conducted a very thorough hearing and entered detailed findings of fact regarding the matter. At the hearing, the prosecutor identified the "John Doe" indictment, number 15-00747, and he stated that he had obtained it by retrieving it from the "clerk's jacket." He noted that the numbers assigned to the "John Doe" indictment and the 2016 indictment reflected that the 2016 indictment was a superseding indictment of the "John Doe" indictment. Ms. Horton testified that a "John Doe" indictment would not be accessible through the computer system used by the clerk's office unless it was specifically linked to a superseding indictment. The trial court found that the "John Doe" indictment had "***continuously*** been in the custody of the office of the Shelby County Criminal Court Clerk." It found that the indictment had not been made accessible to the Defendant or the public because, pursuant to Tennessee Code Annotated sections 40-13-111 and -112, it is a misdemeanor to allow any person other than the judge, the prosecutor, and the clerk to inspect an indictment against a person not in custody prior to its being served. *See* T.C.A. §§ 40-13-111 ("When an indictment is found against any person not in actual custody or who has not given bail to answer to the indictment, that indictment shall not be inspected by any person except the judge and clerk of the court and the district attorney general until the defendant has been arrested."); -112(a); -112(b) (making disclosure of the indictment a Class A misdemeanor). The trial court concluded that the "John Doe" indictment should be included in the appellate record because it accurately reflected what transpired in the trial court with respect to issues raised on appeal.

The Defendant's supplemental brief challenged the authentication of the "John Doe" indictment. Under Tennessee Rule of Evidence 902(4), no extrinsic evidence of authenticity is required for:

A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office (including data compilations in any form), certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any Act of Congress or the Tennessee Legislature or rule prescribed by the Tennessee Supreme Court.

Tenn. R. Evid. 902(4). Here, the indictment was recorded or filed in a public office and certified as correct by the custodian of records. *Id.* The certification bore a seal purporting to belong to "a political subdivision, department, office, or agency" of the State. *See* Tenn. R. Evid. 902(1). In any event, the document was authenticated on remand by the testimony of the ADA, who identified the "John Doe" indictment as the one he retrieved from the "clerk's jacket." The Defendant claimed in his brief urging this court to strike the document that the circumstances of the preparation of the document indicated a lack of trustworthiness under Tennessee Rule of Evidence 803(8) because the clerk initially supplemented the record with a certification that the indictment could not be located. We note that this Rule pertains to hearsay, but in any event, the trial court found that the indictment had been continuously in the clerk's possession and was simply not produced due to the statutory mandates in Tennessee Code Annotated sections 40-13-111 and -112.

The trial court ordered the record to be supplemented with the "John Doe" indictment. We conclude that there are no "extraordinary circumstances" which would undermine the conclusive nature of the trial court's determination. *See* Tenn. R. App. P. 24(e). Therefore, we will consider the "John Doe" indictment in evaluating the Defendant's claim that the statute of limitations prohibits his prosecution.

### B. Statute of Limitations

The Defendant asserts that the trial court erred in reviewing the issue regarding the statute of limitations for plain error because he was not required to raise the issue prior to trial. He also argues that prosecution was barred because it was not begun in the statutory limitations period and that even if the "John Doe" indictment was timely returned, the superseding indictment failed to plead tolling facts. The State responds that the prosecution was properly commenced prior to the expiration of the statute of limitations through the filing of the "John Doe" indictment.

Prosecution of a felony offense is barred unless it is begun within the statutory limitations period. T.C.A. § 40-2-101. The limitations period serves to protect against delay and the use of stale evidence and serves as an incentive to efficient prosecution.

- 13 -

*State v. Burdick*, 395 S.W.3d 120, 124 (Tenn. 2012). A statute of limitations is not jurisdictional but may be waived so long as the waiver is knowingly and voluntarily entered. *State v. Pearson*, 858 S.W.2d 879, 887 (Tenn. 1993). Although the right to timely prosecution is not a fundamental right, it is nevertheless "substantial." *Id.* "To determine whether a knowing and voluntary waiver of the statute of limitations exists, the court utilized 'the same standard applied in determining whether there has been an effective waiver as to fundamental rights.'" *State v. Shell*, 512 S.W.3d 267, 274 (Tenn. Crim. App. 2016) (quoting *Pearson*, 858 S.W.2d at 887). The relinquishment of the right to a timely prosecution may not be presumed from a silent record. *Pearson*, 858 S.W.2d at 887. Here, we agree with the Defendant that the record does not indicate that he waived his right to indictment within the limitations period.

The prosecution for a Class A felony offense must be begun within fifteen years. T.C.A. § 40-2-101(b)(1) (1998); T.C.A. § 39-13-502(b) (2000) (classifying aggravated rape as a Class A felony). "A prosecution is … commenced, within the meaning of this chapter, by finding an indictment or presentment or the issuing of a warrant identifying the offender by a deoxyribonucleic acid (DNA) profile." T.C.A. § 40-2-104 (2013); *see* 2013 Tennessee Laws Pub. Ch. 205 § 2 (noting that the amendment related to indictment by DNA profile "shall apply to the commencement for any offense, regardless of when committed" so long as the limitations period has not expired).

A superseding indictment is one obtained without dismissal of the prior indictment, and the prosecution has the broad discretion to seek a superseding indictment so long as jeopardy has not attached. *State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000). "Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial." *Id.*

So long as a timely indictment is pending and the charges are neither broadened nor substantially amended, the superseding indictment may be filed after the statute of limitations has run. *State v. Lawson*, 291 S.W.3d 864, 872 (Tenn. 2009). "Further, the subsequent indictment need not include 'commencing facts' to establish that the prosecution was timely and initiated by other of the statutory methods." *Id.* The Defendant's argument that "the original indictment must be specifically pled as a 'tolling fact' to justify the issuance of a time-barred indictment" is contrary to law. When an indictment has been timely issued, a superseding indictment need not allege facts showing that the prosecution was commenced within the limitations period. *State v. Nielsen*, 44 S.W.3d 496, 499-500 (Tenn. 2001) (distinguishing *State v. Comstock*, 326 S.W.2d 669 (Tenn. 1959), relied on by the Defendant here, on the basis that the timely filed indictment in *Comstock* had been quashed); *State v. Messamore*, 937 S.W.2d 916, 919 (Tenn. 1996) (the State was not required to plead tolling facts when prosecution was

timely commenced by means other than the indictments, which were returned after the limitations period).

Because "a DNA profile exclusively identifies an accused with nearly irrefutable precision," the inclusion of a DNA profile on a "John Doe" warrant is sufficient to identify a defendant with reasonable certainty as required by constitution and statute. *Burdick*, 395 S.W.3d at 128 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7; T.C.A. § 40-6-208; Tenn. R. Crim. P. 4(c)(1)(B)). Accordingly, "[a] criminal prosecution is commenced if, within the statute of limitations for a particular offense, a warrant is issued identifying the defendant by gender and his or her unique DNA profile. Furthermore, a superseding indictment in the defendant's proper name provides the requisite notice of the charge." *Id.* at 130.

In his motion to strike, the Defendant asserts that he has never been identified as the person in the "John Doe" indictment because the jury was not provided the "John Doe" indictment and accordingly never made a factual finding that he was the person whose DNA was listed in the "John Doe" indictment. He does not, and cannot, cite any authority for the proposition that the jury was required to find beyond a reasonable doubt that his DNA was listed in the original "John Doe" indictment. The jury found beyond a reasonable doubt that the Defendant's DNA was recovered from the victim's vaginal swabs, and accordingly, his identity was properly established at trial. We note that the exhibits contain analysis listing the numerical DNA profile obtained from the sperm in the swabs, which matches that listed in the "John Doe" indictment, and that Special Agent James testified that the Defendant's known DNA matched the DNA from the swabs. In any event, the Defendant never presented to the trial court his contention that the indictment did not name him because his DNA did not match that listed in the "John Doe" indictment, and he never challenged the superseding indictment on this ground below. Accordingly, the court was not given the opportunity to make any factual findings regarding the identity of the DNA listed in the "John Doe" indictment. Insofar as this issue is raised, it is waived, and the Defendant is not entitled to relief. *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived.").

Here, the "John Doe" indictment, listing the Defendant's genetic profile and naming the victim and date, was returned on February 12, 2015, within the fifteen-year statutory limitations period. A superseding indictment was returned in 2016, after the Defendant was identified by name. The trial court found on remand that the "John Doe" indictment had been continuously in the possession of the trial court clerk after it was issued. The court further found, consistent with the testimony of the ADA, that after the Defendant was identified as the perpetrator through his DNA, the indictment was

- 15 -

superseded by the 2016 indictment which named the Defendant. The Defendant was timely indicted and is not entitled to relief.

## II. Authentication and Chain of Custody

The Defendant next asserts that the sexual assault kit should not have been admitted because it could not be properly authenticated due to a break in the chain of custody. He asserts that the authenticity of the sexual assault kit is "highly suspect because of inaccuracies and inconsistencies glaring enough to require the creation of an 'amended' chain of custody." He contends that Special Agent James "was able to receive the kit on July 12, four days before it was received by the TBI" and that the kit had been "misidentified" when a report showed it as "purportedly submitted to the TBI on December 13, 2013 despite having already been in the possession of the TBI since July." We conclude that the evidence presented to the trial court was adequate to establish the identity and integrity of the evidence.

Tennessee Rule of Evidence 901 requires that physical evidence be authenticated prior to its admission, and authentication requires evidence sufficient "to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "[I]t is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)). Evidence should not be admitted if its identity and integrity cannot be demonstrated by chain of custody or other appropriate means. *Scott*, 33 S.W.3d at 760. This requirement is meant to preclude the possibility that the evidence has been subject to tampering, substitution, or mistake. *Cannon*, 254 S.W.3d at 296. Authentication requires that each link in the chain be sufficiently established, but "[a]n item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item." *Id.* The State is not required to prove the identity of the evidence beyond all possible doubt or to exclude every possibility of tampering. *Id.* Instead, it must "reasonably establish the identity and integrity of the evidence." *Id.* If the State does not offer sufficient proof of the chain of custody of the item, it is not admissible unless its identity and integrity are demonstrated by other appropriate means. *Id.* (citing *Scott*, 33 S.W.3d at 760). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *State v. Terry Scott*, No. E2003-00360-CCA-R3-CD, 2003 WL 22326980, at *2 (Tenn. Crim. App. Oct. 9, 2003).

A trial court's decision to admit evidence based on establishing a chain of custody is reviewed for abuse of discretion. *Scott*, 33 S.W.3d at 752. This court will not reverse the trial court's decision to admit evidence unless the court applied an incorrect legal

standard or reached a decision which was against logic or reasoning and which caused an injustice to the complaining party. *Cannon*, 254 S.W.3d at 295.

At trial, the State presented testimony from Ms. DiScenza that she had collected DNA evidence by swabbing the victim and that she had placed the swabs into the sexual assault kit, sealed the kit, and placed the kit into a locked storage area. She was able to identify the sexual assault kit as the one she collected from the victim through her signature and markings. Mr. Smith then transported the evidence from the locked area of the Memphis Sexual Assault Resource Center to the north precinct on Old Allen Road, where it was placed in a locked, temperature-controlled room. He was likewise able to identify the evidence through his signature. The trial court was also presented with a supplement written by Ms. Garner which reflected that she recovered the kit from Old Allen Station on July 6, 2012, and that on July 16, 2012, she released it to the property and evidence room, immediately received it back, and delivered it to the TBI. She transported the kit from the TBI back to the property and evidence room of the Memphis Police Department on January 31, 2013; transported the kit from the property and evidence room back to the TBI on July 2, 2013; and returned it to the property and evidence room on February 10, 2014. A chain of custody report reflecting the transfers to and from the property room was also presented to the trial court.

Special Agent James testified that he received the kit on July 16, 2012. He identified the kit through seals, markings, barcodes, his initials, and its unique lab number. The kit was sealed and showed no signs of tampering when he received it. After isolating sperm cells, he resealed the kit. He received the kit again for further testing on July 2, 2013, at which time the kit remained sealed and intact. Accordingly, the State presented witnesses establishing that the evidence was collected by Ms. DiScenza and that it was sealed by her and remained sealed until Special Agent James conducted testing on it. The evidence had spent a number of years at a locked and temperature-regulated storage facility, from which Ms. Garner retrieved it in 2012, prior to transferring it to the property and evidence room and subsequently to the TBI. The evidence was returned to the Memphis Police Department's property and evidence room and then again transferred by Ms. Garner for further testing to the TBI, where Special Agent James again received it in a sealed condition. We conclude that the trial court did not abuse its discretion in finding that the chain of custody was properly established. *See, e.g.*, *State v. Tony Gibson*, No. W2017-01235-CCA-R3-CD, 2018 WL 4677521, at *7 (Tenn. Crim. App. Sept. 28, 2018) (the identity and integrity of the evidence was reasonably established when the officer who retrieved and transported the evidence did not testify, but other witnesses testified regarding the collection of the evidence and there was a lack of evidence suggesting tampering); *State v. Kevin Allen Fleming*, No. E2016-01746-CCA-R3-CD, 2018 WL 1433503, at *15-17 (Tenn. Crim. App. Mar. 22, 2018) (the chain of custody was adequately established when the trooper observed the

collection of the blood, sealed the kit, and took it to a secure evidence locker, and when the TBI agent testified regarding the integrity of the evidence once it was placed into the TBI drop box); *State v. Randy Timothy Jones*, No. M2017-00769-CCA-R3-CD, 2018 WL 1182573, at *5-6 (Tenn. Crim. App. Mar. 7, 2018) (the chain of custody was sufficiently established by the trooper's testimony that he witnessed the collection of the blood, labeled and sealed it, and put it into a locked evidence drop box, and by testimony that the forensic technician received the box and that it was sealed and gave no indication of tampering); *State v. Charles Drake*, No. E2004-00247-CCA-R3-CD, 2005 WL 1330844, at *14 (Tenn. Crim. App. June 6, 2005) (the chain of custody was adequately established when the officer who witnessed the collection of DNA evidence testified and the TBI technician testified regarding the circumstances around her receipt of the evidence and regarding its sealed condition, even though the transporting officer did not testify); *compare Cannon*, 254 S.W.3d at 298 (the chain of custody was not established when there was contradictory proof regarding whether or in what manner the evidence was recovered from the victim); *Scott*, 33 S.W.3d at 760-61 (the evidence was not properly authenticated when it had been mounted on slides and there was no testimony explaining this alteration in the condition of the evidence); *State v. Michael R. Anderson*, No. M2008-01230-CCA-R3-CD, 2009 WL 856903, at *3-4 (Tenn. Crim. App. Mar. 31, 2009) (the chain of custody was not established when the State did not present evidence regarding the sealing of the kit or what steps were taken to identify it to reduce the possibility of mistake).

The Defendant contends that, despite this evidence, the chain of custody contains irregularities which require a finding that the identity of the kit was not reasonably established. Initially, the Defendant's claim that the evidence was received by Special Agent James on July 12, 2012, has no support in the record. The Defendant cites to the January 8, 2013, report, but this report indicates, consistently with the other evidence, that the kit was received by the TBI on July 16, 2012.

The Defendant also attacks the chain of custody based on an addendum to the TBI lab report. The unsigned addendum, which begins on "Page 2" and appears to have initials consistent with Special Agent James's, states that the author became aware that evidence in an unrelated case was missing a submittal form, although TBI records reflected the evidence had been submitted on December 13, 2012. In investigating, the author discovered that the evidence in this unrelated case had not in fact been submitted on that date but had been in the continuous possession of the TBI since 2010. Out of caution, he investigated two other cases which were purportedly submitted by the same investigator from the Shelby County District Attorney's office on the same date. In one of the cases, evidence was actually submitted on that date. The report reflects that, in the Defendant's case, the evidence was not submitted on December 13, 2012, but was in the TBI's possession and "being worked" on that date. The report concluded that the

- 18 -

evidence transfer noted in the system for that date was erroneous. Two reports related to the Defendant's case were amended to reflect the correct chain of custody.

The Defendant asserts that this report raises questions regarding the authenticity of the evidence. However, this particular contention has been waived. The partial TBI report was introduced for the first time into the record by the Defendant at the hearing on the motion for a new trial as "the analysis that was provided to us in discovery by the State." At trial, the Defendant never argued that there was an error discovered by the TBI with respect to the chain of custody; instead, he merely asserted that the State had not established the chain of custody. Because the partial report was not raised at trial and was not before the trial court, the trial court did not have the opportunity to consider this evidence when it made its determination regarding the chain of custody at trial, and the State did not have any reason to elicit any testimony from Special Agent James regarding the partial report. The trial court, based on the evidence before it, ruled that the chain of custody had been adequately established. Furthermore, this particular issue was not raised in the motion for a new trial. At the motion hearing, the Defendant presented a cursory argument that the trial court had erred in its chain of custody determination. He also argued that an affidavit from his own expert demonstrated that the State's expert had miscalculated the probability that the Defendant's DNA was the DNA recovered from the swabs. The Defendant introduced the discovery related to DNA analysis only to be considered as the data that the Defendant's own expert had relied on in forming her opinion, and the partial report at issue was page fifty-one of the 105 pages of discovery introduced as an exhibit. The trial court made no ruling regarding the effect of the partial report on the authentication of the evidence because the issue was not raised. Accordingly, this particular objection is waived. *See State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016) ("It is well-settled that a defendant may not advocate a different or novel position on appeal."); *Johnson*, 970 S.W.2d at 508. Because the trial court did not abuse its discretion in determining that the identity and integrity of the evidence was adequately established by testimony that it was collected from the victim, sealed, stored in a locked facility, and remained sealed at the time the TBI received it for analysis, the Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 19 -